II.
But the methodical way in which Applicant, by himself, carried out his crimes paints the exact opposite picture. Applicant raped and murdered six women between September 4, 1987 and March 14, 1988.[12] All of the victims' bodies were found buried in shallow graves in the same desert area northeast of El Paso. They were all approximately 30 to 40 yards from one of the dirt roadways in the desert. Four of the bodies were found in various *684 states of undress, indicating that the killer had sexually abused them. Five of the victims were seen by witnesses on the day of their disappearance accepting a ride from a man with either a red Harley-Davidson motorcycle or a beige pickup truck. Applicant owned two vehicles matching those descriptions. Witnesses identified Applicant as the last person seen with four of the victims. Applicant also kept a burnt orange blanket and some shovels in the back of his pickup truck. Orange fibers found on one of the victim's clothing matched orange fibers taken from a vacuum cleaner bag that Applicant and his then-girlfriend left in their old apartment.
But a seventh victim survived. Judith Kelly, a prostitute and heroin addict, testified that in July 1987 she had been walking outside a convenience store in the northeast part of El Paso when Applicant asked her if she needed a ride. Kelly got in Applicant's truck, but Applicant did not drive her home. Instead, he stopped at an apartment complex and went inside while she stayed in the truck. When he returned, she noticed a piece of rope hanging from one of his pockets. Applicant drove towards the desert, and, after driving around awhile, stopped the truck, got out, and ordered Kelly out as well.
Kelly saw Applicant get a "brownish red" blanket and shovel out of the back of his truck. Applicant then tied Kelly to the front of his truck while he proceeded to dig a hole behind some bushes. This took ten to fifteen minutes. Applicant then returned with the blanket and forced Kelly to the ground, ripping her clothes. However, Applicant stopped when he heard voices. He ordered Kelly back into the truck and drove to a different location in the desert.
Applicant stopped his truck again, ordered Kelly out, spread the blanket on the ground, and forced Kelly to remove her clothes. He then gagged her, tied her to a bush, and raped her. Immediately afterwards, Applicant stated he heard voices again. He threw his belongings back into the truck and drove away. He left Kelly naked in the desert. His last words to her were "[A]lways remember, I'm free."
Applicant told his cellmate, Randy Wells, about the murders. Applicant described the victims as topless dancers or prostitutes and detailed how he would lure each girl into his pickup truck by offering her drugs. Then, according to Applicant, he would drive out into the desert, tie the victim to his truck, and dig her grave. Then, he would tie her to a tree and rape her. James Carl Sweeney, Jr., another cellmate, testified that Applicant had kept news clippings about the murders. Applicant confessed to Sweeney, Jr., that he had committed those murders.
III.
And yet, Applicant argues that he is categorically exempt from the death penalty because, under clinical diagnostic criteria, he is intellectually disabled. As the habeas court noted, Applicant's IQ scores range between 64 to 111. The Supreme Court has recently explained that we are not allowed to look at "sources of imprecision in administering the test to a particular individual" to narrow the test-specific standard-error range.[13] The Court made this observation to reject the argument that courts can consider factors "unique" to the test-taker when evaluating multiple IQ tests.[14]
Here, the habeas court relied primarily upon the test administered by Dr. Thomas *685 Allen resulting in an IQ score of 75 because it was the only test that was comprehensive and conducted properly. The habeas court's observations in this regard seem to place weight on the score of 75 not because of factors "unique" to the test-taker, but because the methodology for that test was the most scientifically reliable. But Dr. Allen also questioned whether that test undersold Applicant's actual IQ because of the possibility that Applicant was malingering. This would seem to rely upon the type of factors "unique" to the test-taker that the Supreme Court believes we should not consider. So would placing less weight on the other tests for similar reasons.
With regard to the evidence of adaptive deficits, the habeas court thoroughly details the evidence related to adaptive deficits in the areas of functional academics, communication, self-care, home-living and money management, social and interpersonal skills, use of community resources, self-direction, work, leisure activities, and health and safety. Certainly this evidence shows how Applicant has many adaptive strengths . But the Supreme Court, in rejecting our reliance upon the infamous " Briseno factors," noted that we are supposed to avoid lay perceptions and stereotypes regarding intellectual disability.[15] Further, we are required to focus upon adaptive deficits without placing "undue emphasis" upon adaptive strengths.[16]
Here, the habeas court noted a great amount of evidence showing Applicant's adaptive strengths, but a dearth of evidence demonstrating adaptive deficits. If we completely ignore the existence of evidence demonstrating adaptive strengths, then this aspect of the inquiry becomes nothing more than a legal choice to credit only mitigation evidence that provides "a basis for a sentence less than death"[17] regardless of the strength of evidence demonstrating a defendant's moral blameworthiness. It would seem to contradict the Supreme Court's requirement that the definition of intellectual disability be calibrated to only include those whose degree of intellectual disability falls within a national consensus regarding moral blameworthiness.[18] On the other hand, we cannot rely solely upon the testimony of "a fourth grade teacher, a childhood friend, and Applicant's sister"[19] to determine adaptive deficits because that approach is built upon lay stereotypes of the intellectually disabled.[20] Ultimately, Moore does not prohibit courts from considering adaptive strengths; it only prohibits placing "undue" emphasis upon them.[21] I do not believe that the habeas court, or this Court, has placed undue emphasis on Applicant's adaptive strengths in this case.
IV.
In the end, I join this Court's opinion because I do not believe Applicant has *686 proven that the categorical exemption from the death penalty applies to him. The Court rejects Applicant's intellectual disability claim by applying current diagnostic standards. But to the extent that Applicant can build a claim of intellectual disability upon the shifting sands of clinical psychological standards detailed in Moore , this case demonstrates that the determination of intellectual disability has become untethered from the original rationale for the exception to the imposition of the death penalty announced in Atkins . Applicant is not intellectually disabled. He is a serial killer.
With these thoughts, I join the Court.
DISSENTING OPINION
Alcala, J., filed a dissenting opinion.
Unlike this Court's majority opinion that declines to reconsider the -02 habeas application filed by David Wood, applicant, I would instead reopen the application on our own motion and remand it to the habeas court for further proceedings. I conclude that applicant's intellectual disability claim that was rejected by this Court in 2014 must be reconsidered in light of the Supreme Court's recent decision in Moore v. Texas , --- U.S. ----, 137 S.Ct. 1039, 197 L.Ed.2d 416 (2017). Because I would order the habeas court to address applicant's instant claim that the prior assessment of his intellectual disability failed to conform with the diagnostic framework endorsed by the Supreme Court in Moore , I respectfully dissent.[1] I explain my conclusion by reviewing applicant's arguments and why I find the majority opinion's analysis unpersuasive.
I. Applicant's Arguments
Applicant asserts that he has significantly subaverage general intellectual functioning and adaptive deficits such that his execution would violate the Eighth and Fourteenth Amendments. Applicant presented evidence at the 2011 Atkins[2] hearing before the convicting court showing that he had IQ scores of 64, 71, and 75, obtained from the administration of WAIS instruments.[3] These low IQ test results are consistent with his performance as a young student. He failed the first, third, and ninth grades, he attended special education classes, and he eventually dropped out of school in the ninth grade at the age of seventeen, at which time he was three years behind his peers in school. He could not read a clock or tell time, even as a teenager. His fourth grade teacher testified that in her thirty-five years of teaching approximately 900 students, applicant was the sole person whom she had required to sit next to her desk because he needed her to personally explain things to him repeatedly. Applicant's problems in school included the absence of close friends and his association with children who were several years younger than him.
II. Analysis
In declining to remand this claim to the habeas court for further consideration, this *687 Court's majority opinion employs the same type of incorrect intellectual disability analysis that it has been conducting mistakenly for over a decade since issuing its opinion in Ex parte Briseno , 135 S.W.3d 1 (Tex. Crim. App. 2004). The instant majority opinion continues to selectively focus on only the IQ scores and adaptive strengths that would support a determination that applicant is not intellectually disabled, despite current medical standards suggesting that this is an inappropriate approach to intellectual-disability determinations.
This Court's majority opinion cherry picks certain IQ scores and treats those scores as dispositive evidence of a lack of intellectual disability. This Court's majority opinion acknowledges that applicant's IQ scores range from 64 to 111, but it dismisses low IQ scores that would indicate subaverage general intellectual functioning as the product of malingering. It uncritically assumes the validity of applicant's higher IQ scores without addressing whether the methods used to obtain those scores would still comport with current medical diagnostic criteria. And perhaps more importantly, this Court's cherry-picked IQ score of 75 provides a worst-case scenario IQ score of 71 based on the "measurement error range." This score is only one point above the cutoff score that would place someone in the range of intellectually disability, when the low end of the IQ score error range is 70 or below. Under the current medical diagnostic framework, it is inappropriate to decide that someone is not intellectually disabled by using a strict cutoff score taken from a cherry picked IQ test.
I agree with applicant that Hall recognized that an IQ score is imprecise and should not be read as a single, fixed, infallible number but rather as a range determined by a standard error of measurement. See Hall v. Florida , 572 U.S. 701, 712, 134 S.Ct. 1986, 188 L.Ed.2d 1007 (2014). I also agree that Hall instructed courts to consider the professional consensus of the medical community in evaluating intellectual disability and that the medical community would not find that applicant is not intellectually disabled merely because his low-end result on one IQ test placed him one point above the range for a diagnosis of intellectual disability. Rather, looking at the range of scores, I conclude that it is necessary to consider whether there is also evidence of adaptive deficits before it could be ultimately determined whether applicant is intellectually disabled. Id.
Furthermore, the habeas court's fact findings regarding adaptive deficits are inadequate even if this Court disregards those findings that directly discuss Briseno . This Court's majority opinion acknowledges that the habeas court's fact findings and conclusions took into account diagnostic standards that are no longer accepted by the medical community, as well as considered the non-medical Briseno factors that the Supreme Court expressly rejected in Moore .See 137 S.Ct. at 1051. The majority opinion suggests that there is enough information in the fact findings numbered one through 279 that it adopts in this case and that it suggests are not based on the Briseno factors. I respectfully disagree because, despite the majority opinion's suggestion, these findings adopted by this Court's majority opinion improperly focus on applicant's adaptive strengths and his abilities in a controlled prison setting. For example, the habeas court found that someone with intellectual disability would not be able to "write coherent, correct sentences with decent punctuation," use sophisticated "words like 'specialist,' " or communicate lucid *688 thoughts in written letters.[4] However, clinical experts have counseled against viewing the presence of adaptive strengths as evidence of the absence of adaptive weaknesses. Further, they caution against considering adaptive strengths arising in controlled settings like a prison. Additionally, the habeas court found that applicant's troubles in school could be due to factors other than intellectual disability, such as "dyslexia or trouble reading, a poor home life, or being held back a grade."[5] The Supreme Court in Moore expressly recognized that other mental or physical impairments are common comorbidities in intellectually disabled persons and are "not evidence that a person does not also have intellectual disability." Moore , 137 S.Ct. at 1051. Because the convicting court's fact findings and conclusions fail to comport with the current medical diagnostic framework, this Court's majority opinion should not adopt them, and it should instead remand this case for further evidentiary development and factual findings under the proper standard.
III. Conclusion
Because the Court declines to remand this case to the convicting court for fact findings and conclusions of law that comport with the current medical diagnostic framework, I respectfully dissent.

Atkins v. Virginia , 536 U.S. 304, 317, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).

Id.

Hall v. Florida , 572 U.S. 701, 709, 134 S.Ct. 1986, 188 L.Ed.2d 1007 (2014).

Atkins , 536 U.S. at 318, 122 S.Ct. 2242.

Moore v. Texas , --- U.S. ----, 137 S.Ct. 1039, 1054, 197 L.Ed.2d 416 (2017) (Roberts, C.J., dissenting).

Wood v. Quarterman , 503 F.3d 408, 410 (5th Cir. 2007), cert. denied , 552 U.S. 1314, 128 S.Ct. 1874, 170 L.Ed.2d 752 (2008).

Moore , 137 S.Ct. at 1049.

Id.

Id. at 1051-52.

Id. at 1052 n.9.

See Eddings v. Oklahoma , 455 U.S. 104, 110, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) (quoting Lockett v. Ohio , 438 U.S. 586, 607, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) ) (effectively defining what constitutes mitigating evidence by holding that the Eighth and Fourteenth Amendments require that a jury not be precluded from considering mitigating evidence).

Atkins , 536 U.S. at 317, 122 S.Ct. 2242.

Majority op. at 681.

Moore , 137 S.Ct. at 1051-52 (rejecting Briseno 's reliance upon lay perceptions of intellectual disability because the medical profession has endeavored to counter lay stereotypes of the intellectually disabled).

See ids="12602607" index="60" url="https://cite.case.law/s-ct/137/1039/">id. at 1052 n.9.