

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-19-00385-CV

_____

IN THE MATTER OF A.K.

On Appeal from the 323rd District Court
Tarrant County, Texas
Trial Court No. 323-107606-18

Before Birdwell, Bassel, and Wallach, JJ.
Memorandum Opinion by Justice Wallach

# MEMORANDUM OPINION

Appellant A.K. appeals the juvenile court's order waiving its jurisdiction and ordering him transferred to an appropriate district court or criminal district court (criminal court) to be prosecuted as an adult for capital murder and aggravated robbery. In three points, Appellant contends that (1) the transfer to a criminal court violated the constitutional provision against cruel and unusual punishment and that Family Code Section 54.02(c) is unconstitutional because it (2) violates the federal and state prohibitions against cruel and unusual punishment and the Fourteenth Amendment's Due Process Clause and (3) denies him the right to a jury determination of a fact issue affecting the upper limits of a possible sentence. Within his first point, Appellant complains that the transfer order was not based on factually sufficient evidence because nothing in the order shows that the juvenile court considered the fact that he is intellectually disabled. Because we hold that the evidence is factually insufficient to support the juvenile court's finding that A.K. is sufficiently sophisticated and mature to be tried as an adult and therefore, in turn, the evidence is factually insufficient to support the juvenile court's determination that A.K.'s background justifies the transfer, we reverse the juvenile court's transfer order and remand this case to that court for further proceedings.

## I. Factual and Procedural Background

The evidence presented at the transfer hearing included (1) a prediagnostic evaluation with the report of Appellant's latest psychological evaluation attached;

(2) his police interview; (3) photographs depicting the crime scene, other evidence of the crime, and the decedent's family; and (4) testimony of Appellant's probation officer and the Fort Worth Police Department detective in charge of the investigation.

Appellant was a fourteen-year-old seventh-grader when the offenses occurred. Despite his youth, Appellant, an alleged member of the 300 Mafia Crips gang, had already had several legal scrapes. He was on juvenile probation for burglary after having had three prior referrals to the juvenile court. After being on probation for burglary for less than a month, he received another referral for criminal trespass and was suspended from school for marijuana possession. On May 18, 2018, the day of his scheduled detention hearing for those two new referrals, Appellant did not appear at the 10:30 a.m. hearing.

A woman was killed by a gunshot to the head around noon that day in a west Fort Worth apartment complex. A nine-millimeter shell casing found by the woman's body had an "RP" headstamp. Viewing a nearby store's surveillance footage, cohorts identified Appellant and another boy as the two teenagers filmed running from that apartment complex that day.

On the night of May 18, 2018, police detained Appellant and three other young men for unrelated gang activity. Appellant carried a loaded magazine of Winchester nine-millimeter shells. The adult male in the group carried a loaded nine-millimeter gun that ballistics later showed fired the casing found by the woman's body. The gun's magazine contained shells with RP headstamps. The man told police the gun

3

was Appellant's. The police learned that Appellant had tried to sell that gun after the murder.

Appellant admitted to the police that he had kicked in the woman's apartment door and had taken her phone, but he denied shooting her and claimed that he was outside the apartment when he heard gunshots inside. His accomplice told the police that Appellant brought the gun, kicked in the door, demanded items from the woman, including her phone, and shot her even after she had given him her phone. Police arrested Appellant two days after the murder, and he remained in custody at the juvenile detention center from the day of his arrest until his transfer hearing almost seventeen months later. Another youth confined in the detention center with Appellant reported that Appellant bragged about shooting the woman and showed no remorse for the murder.

The State filed its petition for discretionary transfer to a criminal court soon after Appellant's arrest. Appellant's latest psychological evaluation was completed in August 2019. It referred to his previously diagnosed ADD/ADHD disorder as well as his documented "physical or mental impairment" that "affected one or more major life activities," including communication, concentration, learning, and thinking. In the evaluation, Appellant was given the Kaufman Brief Intelligence Test. His composite IQ was 68. On the Wide Range Achievement Test, he performed under a second-grade level. The psychologist noted in the evaluation that he did not try to answer any questions that he thought were too hard. She opined, "Subsequently, his intellectual

4

and academic functioning appear to be an underestimate of his ability." The psychologist concluded that he would benefit from juvenile services "such as a high level of structure and supervision." However, she also found that he was not mentally retarded, understood the legal implications of a discretionary transfer motion, and could assist his lawyer.

In the hearing, the probation officer spoke of Appellant's background. Before Appellant was involved with the juvenile department, he had lived at All Church Home for a time and had also been in foster care. While he was in foster care, he received counseling for behavioral issues at school. He also received an MHMR evaluation in which he was diagnosed with disruptive behavior disorder and ADHD. He was prescribed medication and had taken it "maybe a year or so." However, Appellant had not been on medication since the probation officer had been working with him despite the absence of evidence that he was "taken off of it." Also, the probation officer was not sure whether Appellant was receiving the accommodations in the detention center that his 504 plan[1] would have required in a normal school setting.

---

[1] "A 504 plan is mandated in public schools and federally funded private schools by Section 504 of the Rehabilitation Act of 1973 for children with a physical or mental condition that substantially impacts a major life activity. *See* 29 U.S.C. § 701 (2012); 34 C.F.R. § 104.33 (2015)." L. Kate Mitchell, *"We Can't Tolerate That Behavior in This School!": The Consequences of Excluding Children with Behavioral Health Conditions and the Limits of the Law*, 41 N.Y.U. Rev. L. & Soc. Change 407, 413 n.27 (2017).

The probation officer also testified that Appellant had behavioral issues at school in the 2017–18 school year, resulting in "manifestation determination"[2] meetings to determine whether his misbehavior resulted from his diagnosed disorders or his choices. The probation officer testified that the school records indicated that Appellant's behavior was more of a choice than a sign of his disability. In that single school year, he held a female classmate in a headlock and pushed her; hit another female student in what he characterized as "a playful way"; brought an air pistol to school; threatened a teacher; and made gang signs toward her.

The probation officer additionally testified about Appellant's time in detention. Even though he was on Level One—the best level—at the time of the hearing, for months at a time, and for a majority of the time, he had been written up during his first several months for making gang signs, not following instructions, not doing his school work, threatening staff members, being disruptive and disrespectful, and fighting. Nevertheless, his probation officer testified that for the most part, Appellant tried to follow the rules and tried to stay on Level One.

---

[2]"When a school seeks to discipline a child with a disability, [the Individuals with Disabilities Education Act] requires that the child's 'individualized education program team' (IEP Team), including the child's parents and educators, conduct a 'manifestation determination review.' An IEP Team is also referred to as an 'admission, review, and dismissal' (ARD) committee. The purpose of the ARD committee's manifestation determination review is to determine whether the child's behavior was a manifestation of the child's disability." *Hollingsworth v. Hackler*, 303 S.W.3d 884, 889 (Tex. App.—Fort Worth 2009, pet. denied) (footnotes omitted).

6

Appellant did not testify at the transfer hearing and his counsel did not call any witnesses. However, his counsel did cross-examine the State's witnesses. Regarding Appellant's not attempting to answer certain questions of the tests evaluating his intellectual ability, the probation officer testified that it "would seem logical[] that someone who struggles academically would be hesitant to try something [he does not] fully understand" because of risks of embarrassment or getting teased and that Appellant's refusal to try to answer the questions did not necessarily indicate misbehavior. The probation officer also admitted that a fourteen- or fifteen-year-old child who acts more like an eleven- or twelve-year-old child could be a child who struggles with interpreting social cues. The probation officer further testified that in his experience, "the adult system is not as equipped to deal with juveniles in the same way [as the juvenile system] because [the adult system] would treat everyone on the same level." The probation officer believed "that the juvenile system would be more successful in rehabilitating [Appellant] at this stage than sending him to the adult system."

The juvenile court decided to waive its jurisdiction and transfer the case to a criminal court, explaining its reasoning from the bench:

> So the Court having reviewed the complete diagnostic study, the social evaluation and full investigation of the child and circumstances of the child and circumstances of the offense ha[s] come to a conclusion. The Court in coming to this conclusion, having heard the competent evidence provided to the Court, is considering various factors. The Court is considering whether this offense was against a person or property. The Court is considering the sophistication and the maturity

7

of the child. The Court is considering the record and previous history of the child, and the Court is also considering the protection of the public and the likelihood of rehabilitation of the child within the juvenile system.

Court finds that the child was 14 years old at the time of the offense, a first-degree felony and capital offense, that there has not been an adjudication hearing yet, and that after a full investigation hearing, the juvenile court will find probable cause that the offense of capital murder and . . . aggravated robbery has occurred and because of the seriousness of the offense as well as the background of the child, the welfare of the community requires criminal proceedings.

Specifically, the reason for this transfer, [Appellant], is I am genuinely concerned about all four factors that are presented to the Court. I've considered all four and all four are very significant to me in your particular case. I am particularly concerned about the safety of the public.

[Appellant], you had a history with the school system with behavior problems and criminal acts. You had a problem—a history with the law. You were supervisory cautioned out of this Court. You were on probation out of this Court. In fact, while you were supposed be in court on May 18th, you skipped court and it resulted in a death of a woman. There's probable cause to determine that it resulted in the death of a woman. Had you come to court, this would not have been an issue. That would have been the ultimate alibi for you had you just done what you were supposed to do. It's apparent to me that you planned the crime. You had a history of burglarizing buildings and homes. I also look at the testimony today and it seems apparent that you never really admitted to your involvement. Seems like you're passing the blame to [your accomplice] and you're creating space for yourself about your engagement in all these matters. It seems like after the offense that you attempt[ed] to hide and conceal your involvement whether it's by discarding your clothing or trying to get rid of the firearm that was used in this offense, and it seems like you were trying to blame someone else this entire time.

And I think what hits the hardest is even in the detention this whole time you were here . . . you had the opportunity to show me that you're rehabilitated, that you're doing well, that you don't need to go to the adult system because everything that the juvenile system can offer,

8

you're taking advantage of. Yet, . . . your time here . . . really indicates to me that the likelihood of rehabilitation in the juvenile system just isn't— there's nothing that we can do for you and this is a matter that simply the adult system needs to handle.

So I am waiving my jurisdiction as the judge of the 323rd District Court, and I'm going to transfer this to an appropriate adult criminal district court here in Tarrant County, Texas.

The juvenile court also issued a written order granting the transfer:

The Court finds that the acts alleged in Paragraphs III and IV of the First Amended Petition on file in this cause are felonies under the penal laws of the State of Texas if committed by an adult. The Court finds that the offenses were against the person of another. The Court finds there is probable cause to believe that the Respondent committed the offenses alleged in Paragraphs III and IV of the First Amended Petition on file in this cause.

The Court finds that the Respondent is of sufficient sophistication and maturity to be tried as an adult. A psychologist who examined the Respondent concluded that he appears capable of understanding the legal implications surrounding a discretionary transfer motion and assisting his attorney in his defense. The facts of the offenses themselves weigh towards the sophistication and maturity of the Respondent to carry out a collaborative scheme. The Respondent obtained and carried a loaded handgun. After the Respondent and his companion saw a video game system in the apartment window, the Respondent kicked in the apartment door. Both the Respondent and his companion entered the apartment, but the Respondent pointed the loaded handgun at the victim, and demanded her property. The Respondent himself not only wielded a firearm during this home invasion, but also shot and killed the victim, who was a mother of three children and cooperated with his demands. After the offenses, the Respondent disposed of the stolen cell phone[] and the clothing he wore during the commission of the offense[] and attempted to dispose of the handgun.

The Court finds that the prospects of adequate protection of the public and the likelihood of the rehabilitation of the Respondent by the use of procedures, services, and facilities currently available to the

9

Juvenile Court is low. The Court finds that the Respondent had prior referrals to the juvenile system for Terroristic Threat, Burglary of a Habitation, Criminal Trespass, and Burglary of a Building, and that the Respondent has received supervision and services from the Tarrant County Juvenile Probation Department (a local Juvenile Probation Department) prior to these offenses. The Court finds that the Respondent has been documented as a member of the 300 Mafia, a criminal street gang. Further, the Court finds that the Respondent was on felony juvenile probation and had both a Motion to Modify that probation and new misdemeanor law violations pending in the Tarrant County Juvenile Court at the time that he is alleged to have committed these offenses. The Court finds that while under the supervision of the Tarrant County Juvenile Probation Department, the Respondent was often truant from school, regularly broke curfew, and committed new law violations. The Respondent had a court appearance to address probation violations scheduled for the same day as the offense. A psychologist who examined the Respondent stated[,] "[T]he community would be at a moderate to high level of risk were he to remain in it." His danger to the community is further demonstrated by the violent nature of the offenses he is accused of, including the fact that he used deadly force without hesitation against a victim in her own home. Finally, because of his present age of 15 years, 11 months, the Respondent could only receive services from the Juvenile Probation Department or the Texas Juvenile Justice Department for a maximum period of time of 37 months.

The Court, after considering all the testimony, diagnostic study, social evaluation, and full investigation, finds that it is contrary to the best interests of the public to retain jurisdiction.

The Court finds that because of the seriousness of the alleged offenses and the background of the Respondent, the welfare of the community requires criminal proceedings.

In making that determination, the Court has considered, as detailed above, and among other matters:

1. Whether the alleged offenses were against person or property, with the greater weight in favor given to the offenses against person;

2. The sophistication and maturity of the child;

10

3. The record and previous history of the child; and

4. The prospects of adequate protection of the public and the likelihood of reasonable rehabilitation of the child by use of procedures, services, and facilities currently available to the Juvenile Court.

THEREFORE, by reasons of the foregoing, I . . . hereby waive jurisdiction of this cause and transfer [Appellant] to the appropriate District Court or Criminal District Court of Tarrant County, Texas for criminal proceedings and do hereby certify said action.

## II. Discussion

We first address Appellant's second and third points challenging the constitutionality of Family Code Section 54.02(c) because if successful, they would afford the greatest relief—a remand to the juvenile court for proceedings without the application of the challenged transfer provision. *See, e.g.*, *In re B.G.*, 317 S.W.3d 250, 258 (Tex. 2010). We then address his first point challenging the transfer decision.

### A. Constitutional Challenges

### 1. Mandatory Sentencing Scheme for Juveniles

Appellant's constitutional challenges to the transfer provision mirror challenges made to the mandatory sentencing scheme for juveniles, so we begin with a brief discussion of that law. Section 12.31(a) of the Texas Penal Code is the punishment provision governing capital felonies, and it provides that life with the possibility of parole is the mandatory punishment for a person found guilty of committing a capital felony under the age of eighteen. Tex. Penal Code Ann. § 12.31(a)(1). In *Miller v. Alabama*, the United States Supreme Court held that automatic life sentences *without*

the possibility of parole for juveniles violated the Eighth Amendment prohibitions against cruel and unusual punishment. 567 U.S. 460, 470, 479, 132 S. Ct. 2455, 2464, 2469 (2012). However, the Texas Court of Criminal Appeals has declined to broaden *Miller*'s scope. In *Lewis v. State*, that court held that automatic life sentences *with* the possibility of parole for juveniles do not violate the Eighth Amendment because they offer juveniles rehabilitation:

> *Miller* does not forbid mandatory sentencing schemes. The mandatory nature of a sentencing scheme is not the aspect that precludes rehabilitation; rather, the sentencing scheme in *Miller* was unconstitutional because it denied juveniles convicted of murder all possibility of parole, leaving them no opportunity or incentive for rehabilitation. Life in prison with the possibility of parole leaves a route for juvenile offenders to prove that they have changed while also assessing a punishment that the Legislature has deemed appropriate in light of the fact that the juvenile took someone's life under specified circumstances.
>
> . . . .
>
> . . . . *Miller* does not entitle all juvenile offenders to individualized sentencing. It requires an individualized hearing only when a juvenile can be sentenced to life without the possibility of parole.

428 S.W.3d 860, 863 (Tex. Crim. App. 2014); *see also McCardle v. State*, 550 S.W.3d 265, 269 (Tex. App.—Houston [14th Dist.] 2018, pet. ref'd). In *Turner v. State*, the Texas Court of Criminal Appeals relied on *Lewis* to reject an Eighth Amendment challenge to Section 12.31(a)(1) as applied. 443 S.W.3d 128, 129 (2014); *see also Matthews v. State*, 513 S.W.3d 45, 61 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd).

12

## 2. Constitutionality of Section 54.02(c)

In his second and third points, Appellant complains that Family Code Section 54.02(c) is unconstitutional on its face and as applied to him because it violates the "cruel and unusual punishment" provisions of the Eighth Amendment to the United States Constitution and Article One, Section 13 of the Texas Constitution, the Fourteenth Amendment's Due Process Clause, and the right under *Apprendi* to have a jury determine any issue of fact affecting the upper range of punishment in a criminal case. Statutes are presumed to be constitutional. *Sax v. Votteler*, 648 S.W.2d 661, 664 (Tex. 1983); *In re J.G.*, 495 S.W.3d 354, 364 (Tex. App.—Houston [1st Dist.] 2016, pet. denied); *see also Peraza v. State*, 467 S.W.3d 508, 514 (Tex. Crim. App. 2015). A party challenging the constitutionality of a statute bears the burden of rebutting the presumption. *Peraza*, 467 S.W.3d at 514; *J.G.*, 495 S.W.3d at 364–65. We endeavor to uphold the statute, "mak[ing] every reasonable presumption in favor of the statute's constitutionality, unless the contrary is clearly shown." *Peraza*, 467 S.W.3d at 514; *see J.G.*, 495 S.W.3d at 365.

When a party challenges the constitutionality of a statute on its face, it attacks the statute, not just a particular application of it, and must show that "no set of circumstances exists under which [the] statute would be valid." *Peraza*, 467 S.W.3d at 514. If the statute could be valid in any circumstance, the facial challenge fails. *Id.* at 515–16. Because of this high burden, a facial challenge rarely succeeds. *United States*

13

*v. Salerno*, 481 U.S. 739, 745, 107 S. Ct. 2095, 2100 (1987); *Allen v. State*, No. PD-1042-18, 2019 WL 6139077, at *3 (Tex. Crim. App. Nov. 20, 2019).

When a party brings an as-applied challenge to a statute's constitutionality, the party claims that the statute, "although generally constitutional, operates unconstitutionally as to the claimant because of his particular circumstances." *Faust v. State*, 491 S.W.3d 733, 743–44 (Tex. Crim. App. 2015) (footnote omitted); *see In re A.J.F.*, 588 S.W.3d 322, 339 (Tex. App.—Houston [14th Dist.] 2019, no pet.).

In his second point, Appellant contends that Family Code Section 54.02 is unconstitutional on its face and as applied because it violates the federal and state constitutions' prohibitions against cruel and unusual punishment and the Fourteenth Amendment's Due Process Clause by "fail[ing] to require the juvenile court to consider the mandatory sentencing scheme for a child convicted of capital murder" and "to take into account whether a juvenile's particularized family history, character, mental capacity, education, background and personal moral culpability . . . require a mandatory sentence of 40 calendar years." Before reaching the merits of this point, we first dispose of claims forfeited by inadequate briefing and by design in oral argument.

*First*, Appellant has not discussed the "cruel and unusual punishment" provision of the Texas Constitution in his brief, nor has he argued that it provides greater protections than the Eighth Amendment. We therefore overrule his claims based on the Texas provision as inadequately briefed. *See* Tex. R. App. P. 38.1(h);

14

*Murphy v. State*, 112 S.W.3d 592, 607 (Tex. Crim. App. 2003); *In re J.B.L.*, 318 S.W.3d 544, 546 n.1 (Tex. App.—Beaumont 2010, pet. denied); *In re R.J.R.*, 281 S.W.3d 43, 50 (Tex. App.—El Paso 2005, no pet.). *Second*, during oral argument, Appellant clarified that he does not argue in this point that the statute is unconstitutional on its face but only that it is unconstitutional as applied to intellectually disabled juveniles. *See* Tex. R. App. P. 39.2. We therefore do not address his briefed arguments in this point that Section 54.02 is unconstitutional on its face. *See* Tex. R. App. P. 47.1.

### a. Appellant's Eighth Amendment "Cruel and Unusual Punishment" Claims

Turning to the merits of Appellant's remaining claims, we overrule his as-applied challenge grounded in the Eighth Amendment for the following five reasons. *See* U.S. Const. amend. VIII. *First*, at the time of the transfer hearing, Appellant was still within the juvenile court's jurisdiction and had not been indicted, tried, charged, or convicted. He had not yet been and may never be subject to the mandatory sentencing scheme. In *State ex rel. Lykos v. Fine*, the Texas Court of Criminal Appeals held that the trial court erred by granting the defendant's pretrial motion to hold the death-penalty sentencing statute unconstitutional as applied, partly because the defendant was "asking Texas trial and appellate courts to entertain a purely hypothetical claim and make an advisory ruling in a case that ha[d] not been litigated to any final resolution." 330 S.W.3d 904, 911–12 (Tex. Crim. App. 2011). Similarly, in *Ex parte Cross*, the El Paso Court of Appeals dismissed the defendant's appeal challenging the constitutionality of the statute he was charged with violating because

15

he had not yet been tried and "[a]ny injury that [he] might suffer [was] therefore still sufficiently contingent or remote such that the issue [was] not ripe for adjudication." 69 S.W.3d 810, 814 (Tex. App.—El Paso 2002, no pet.). Appellant's challenge is to the transfer statute, which was implemented. However, that challenge is based on the mandatory sentencing scheme. Any complaint regarding Appellant's facing a mandatory sentence of life with parole is not ripe for review, however it is couched.

*Second*, Section 54.02 is not a punishment provision but a transfer provision. Tex. Fam. Code Ann. § 54.02. Section 12.31 of the Penal Code is the punishment provision. Tex. Penal Code Ann. § 12.31(a). A transfer hearing is a "nonadversarial preliminary hearing" in which the juvenile court determines whether there is probable cause to believe the respondent committed the alleged crime. *Navarro v. State*, Nos. 01-11-00139-CR, 01-11-00140-CR, 2012 WL 3776372, at *5 (Tex. App.— Houston [1st Dist.] Aug. 30, 2012, pet. ref'd) (mem. op., not designated for publication); *In re D.W.L.*, 828 S.W.2d 520, 524 (Tex. App.—Houston [14th Dist.] 1992, no pet.). It is not a trial on the merits. *State v. Lopez*, 196 S.W.3d 872, 874 (Tex. App.—Dallas 2006, pet. ref'd).

*Third*, the Texas Court of Criminal Appeals has upheld the mandatory life-with-parole sentencing scheme in response to mitigation-consideration arguments. *Turner*, 443 S.W.3d at 129; *Lewis*, 428 S.W.3d at 863. Those holdings signal that constitutional challenges to the transfer statute grounded in the necessity of sentence-focused consideration of mitigation evidence should likewise fail.

16

*Fourth*, Appellant argues in this point that under *Moon*, a "court need not consider or make a finding on the mitigation evidence that encompasses the sophistication and maturity issues," implying that the juvenile court did not consider the mitigation evidence here. While it is true that the juvenile court is not required to find that every Section 54.02(f) factor supports transferring the case, *Moon v. State*, 451 S.W.3d 28, 47 & n.78 (Tex. Crim. App. 2014) (citing *Hidalgo v. State*, 983 S.W.2d 746, 754 (Tex. Crim. App. 1999)), *Moon* and section 54.02 require the juvenile court to *consider*, at a minimum,

> (1) whether the alleged offense was against person or property, with greater weight in favor of transfer given to offenses against the person; (2) the sophistication and maturity of the child; (3) the record and previous history of the child; and (4) the prospects of adequate protection of the public and the likelihood of the rehabilitation of the child by use of procedures, services, and facilities currently available to the juvenile court.

*Id.* at 38 (quoting Section 54.02(f)). The juvenile court must also "make specific findings of fact regarding each of the section 54.02(f) factors." *J.G.*, 495 S.W.3d at 367; *see Moon*, 451 S.W.3d at 47. Mitigation evidence falls within those factors; the juvenile court is therefore required to consider it.

In *J.G.*, the respondent argued that Section 54.02(j), the transfer provision which applies to respondents over the age of eighteen, did "not allow the juvenile court to consider [his] greater need for rehabilitation and the lesser weight placed on retribution when making [the] transfer decision" and therefore violated the Eighth Amendment prohibition against cruel and unusual punishment as applied to him.

17

495 S.W.3d at 369. The appellate court noted that when making the transfer decision, the juvenile court did consider respondent's "prior history with the juvenile justice system, the rehabilitative placements that were made, his lack of cooperation with those rehabilitative goals, and the escalation of his criminal conduct." *Id.* The appellate court therefore held that Section 54.02(j) did not violate the Eighth Amendment as applied to the respondent. *Id.* In Appellant's case, although we hold below that the evidence is factually insufficient to support the transfer, we cannot conclude from the juvenile court's oral rendition and written order that it did not consider *any* mitigation evidence. For example, the oral rendition and written order both indicate that the juvenile court considered the diagnostic report and the psychologist's evaluation. For all these reasons, we hold that Section 54.02 as applied to Appellant did not violate the Eighth Amendment.

### b. Appellant's Fourteenth Amendment Due Process Claims

We also overrule Appellant's as-applied challenge grounded in the Due Process Clause of the Fourteenth Amendment. *See* U.S. Const. amend. XIV. In *Kent v. United States*, the Supreme Court held that the transfer "hearing must measure up to the essentials of due process and fair treatment." 383 U.S. 541, 562, 86 S. Ct. 1045, 1057 (1966). Due process mandates "a hearing, including access to the social records and probation or similar reports which presumably are considered by the court, and . . . a statement of reasons for the Juvenile Court's decision." *Id.* at 557, 86 S. Ct. at 1055; *J.G.*, 495 S.W.3d at 367 (quoting same in Section 54.02(j) case). A transfer

hearing was held in this case, Appellant does not argue that he lacked access to the documentary evidence considered by the court, and the order states some reasons for the decision. We therefore hold that Appellant received due process under the statute. We overrule Appellant's second point.

### c. Appellant's *Apprendi* Claims

In his third point, Appellant complains that Section 54.02(c) is unconstitutional on its face and as applied because it violates his right under *Apprendi* to have a jury determine facts that impact the upper range of punishment in a criminal case. *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348 (2000). The United States Supreme Court held in *Apprendi* that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490, 120 S. Ct. at 2362–63. The prescribed statutory maximum punishment for capital murder committed by a juvenile is confinement for life with the possibility of parole. Tex. Penal Code Ann. § 12.31(a). The transfer from juvenile court to criminal court does not "increase th[at] penalty beyond the prescribed statutory maximum." *Lopez*, 196 S.W.3d at 875. *Apprendi* therefore does not require that a jury find facts allowing the transfer of a juvenile from the juvenile court to a criminal court. *Id.* Consequently, we hold that Section 54.02(c)'s failure to require that a jury determine whether to transfer a juvenile to a criminal court does not make it unconstitutional on its face. *See id.* We further hold, for the same reason, that Section 54.02 as applied to

Appellant did not violate his rights to a jury trial guaranteed by the Sixth and Fourteenth Amendments. *See Rivera v. State*, Nos. 05-06-00026-CR, 05-06-00027-CR, 2007 WL 3245610, at *4 (Tex. App.—Dallas Nov. 5, 2007, no pet.) (not designated for publication). We overrule Appellant's third point.

## B. Factually Insufficient Evidence to Support the Transfer Order

In his first point, Appellant contends that the juvenile court's transferring him to a criminal court violated the constitutional prohibition against cruel and unusual punishment. Within his first point, Appellant argues that the juvenile court's decision was based on factually insufficient evidence, contending that "nothing in the transfer order . . . indicates that the [juvenile] court considered or weigh[]ed A.K.'s intellectual disability." We agree that the juvenile court's decision was based on factually insufficient evidence.

## 1. Applicable Law

Transferring a juvenile from juvenile court to criminal court should be "the exception not the rule; . . . whenever feasible, children and adolescents below a certain age should be 'protected and rehabilitated rather than subjected to the harshness of the criminal system.'" *Moon*, 451 S.W.3d at 36 (quoting *Hidalgo*, 983 S.W.2d at 754). In Texas and as applicable to the case before us, juvenile courts may exercise their discretion to waive their jurisdiction and transfer juveniles to a criminal court if

(1) the child is alleged to have violated a penal law of the grade of felony;

(2) the child was:

20

(A) 14 years of age or older at the time [of the alleged offense], if the offense is a capital felony . . . , and no adjudication hearing has been conducted concerning that offense; [and]

. . .

(3) after a full investigation and a hearing, the juvenile court determines that there is probable cause to believe that the child before the court committed the offense alleged and that because of the seriousness of the offense alleged or the background of the child [or both] the welfare of the community requires criminal proceedings.

Tex. Fam. Code Ann. § 54.02(a); *Moon*, 451 S.W.3d at 38. In making these determinations, the juvenile court must consider the following nonexclusive factors:

(1) whether the alleged offense was against person or property, with greater weight in favor of transfer given to offenses against the person;

(2) the sophistication and maturity of the child;

(3) the record and previous history of the child; and

(4) the prospects of adequate protection of the public and the likelihood of the rehabilitation of the child by use of procedures, services, and facilities currently available to the juvenile court.

*See* Tex. Fam. Code Ann. § 54.02(f); *Moon*, 451 S.W.3d at 38. These factors enable the juvenile court to balance the juvenile's potential danger to the public against his amenability to treatment. *Moon*, 451 S.W.3d at 38. The State has the burden to produce evidence that persuades the juvenile court, by a preponderance of the evidence, that waiving its jurisdiction and transferring the case to the criminal court is the best course of action. *Id.* at 45.

When the juvenile court waives its jurisdiction, "it shall state specifically in the order its reasons for waiver and certify its action, including the written order and

21

findings of the court, and shall transfer the person to the appropriate court for criminal proceedings." Tex. Fam. Code Ann. § 54.02(h). That is, the juvenile court should "'show its work' . . . by spreading its deliberative process on the record, thereby providing a sure-footed and definite basis from which an appellate court can determine that its decision was in fact appropriately guided by the statutory criteria, principled, and reasonable." *Moon*, 451 S.W.3d at 49.

## 2. Standard of Review

This court recently explained how we review a waiver and transfer order:

> In evaluating a juvenile court's decision to waive its jurisdiction under Section 54.02(a), we first review the juvenile court's specific findings of fact regarding the Section 54.02(f) factors under "traditional sufficiency of the evidence review." In this context, our sufficiency review is limited to the facts that the juvenile court expressly relied upon in its transfer order.

> We then review the juvenile court's ultimate waiver decision for an abuse of discretion. That is to say, in deciding whether the juvenile court erred to conclude that the seriousness of the offense alleged or the background of the juvenile or both called for criminal proceedings for the welfare of the community, we simply ask, in light of our own analysis of the sufficiency of the evidence to support the Section 54.02(f) factors and any other relevant evidence, whether the juvenile court acted without reference to guiding rules or principles. In other words, was the juvenile court's transfer decision essentially arbitrary, given the evidence upon which it was based, or did it represent a reasonably principled application of the legislative criteria? In conducting our review, we bear in mind that not every Section 54.02(f) factor must weigh in favor of transfer to justify the juvenile court's discretionary decision to waive its jurisdiction.

*In re K.W.*, No. 02-19-00323-CV, 2020 WL 98144, at *4 (Tex. App.—Fort Worth Jan. 9, 2020, no pet.) (citations and internal quotation marks omitted) (quoting *In re T.L.*,

22

No. 02-19-00200-CV, 2019 WL 4678565, at *3–4 (Tex. App.—Fort Worth Sept. 26, 2019, no pet.) (mem. op.)).

When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all the pertinent record evidence, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the finding should be set aside and a new trial ordered. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965). When reversing for factual insufficiency, we detail the evidence relevant to the point in consideration and clearly state why the finding is factually insufficient—that is, why the evidence supporting the finding is so weak or is so against the great weight and preponderance of the evidence that the finding is manifestly unjust, shocks the conscience, or clearly demonstrates bias. *Pool*, 715 S.W.2d at 635.

### 3. Analysis

The transfer order states that the juvenile court determined that the welfare of the community required criminal proceedings because of both Appellant's background and the seriousness of the alleged offenses and that the juvenile court considered the four Section 54.02(f) factors listed above. The transfer order also details the facts the juvenile court found regarding each factor. With his sufficiency complaint that there is no evidence that the juvenile court considered his intellectual

23

disability, Appellant challenges the factual sufficiency of the evidence supporting the juvenile court's finding that he is sufficiently sophisticated and mature to be tried as an adult and supporting the juvenile court's related determination that his background justifies the transfer. The order provides the following regarding the sophistication-and-maturity factor,

> The Court finds that [Appellant] is of sufficient sophistication and maturity to be tried as an adult. A psychologist who examined [him] concluded that he appears capable of understanding the legal implications surrounding a discretionary transfer motion and assisting his attorney in his defense. The facts of the offenses themselves weigh towards the sophistication and maturity of [Appellant] to carry out a collaborative scheme. [He] obtained and carried a loaded handgun. After [Appellant] and his companion saw a video game system in the apartment window, [Appellant] kicked in the apartment door. Both [he] and his companion entered the apartment, but [Appellant] pointed the loaded handgun at the victim[] and demanded her property. [Appellant] himself not only wielded a firearm during this home invasion, but also shot and killed the victim, who was a mother of three children and cooperated with his demands. After the offenses, [Appellant] disposed of the stolen cell phone[] and the clothing he wore during the commission of the offense[] and attempted to dispose of the handgun.

Thus, the facts the juvenile court expressly relied on in finding that Appellant is sufficiently sophisticated and mature are the psychologist's conclusion that he appears capable of understanding the legal ramifications of being transferred to criminal court and of helping his attorney with his defense and the facts of the offenses themselves. In light of all the evidence pertaining to Appellant's sophistication and maturity, we hold that these facts are not enough to support the finding.

*First*, the contents of the psychological evaluation provide prima facie evidence that Appellant meets the United States Supreme Court's test for intellectual disability, but the juvenile court does not address this fact. The Supreme Court's test for intellectual disability is

> (1) intellectual-functioning deficits (indicated by an IQ score approximately two standard deviations below the mean—*i.e.*, a score of roughly 70—adjusted for the standard error of measurement); (2) adaptive deficits (the inability to learn basic skills and adjust behavior to changing circumstances); and (3) the onset of these deficits while still a minor.

*Moore v. Tex.*, 137 S. Ct. 1039, 1045 (2017) (citations and internal quotation marks omitted). Appellant satisfies all three elements. The psychologist did not testify. The juvenile court only had the psychologist's written evaluation. That evaluation shows that in August 2019, Appellant's composite IQ on the Kaufman Brief Intelligence Test was 68. He therefore meets the first element of the test. *See id.* Adaptive deficits, the subject of the second element of the Supreme Court's test, must be shown in one of the three adaptive areas: social, conceptual, or practical. *Id.* at 1050; *see* American Psychiatric Association, *Diagnostic and Statistical Manual of Disorders* 33 (5th ed. 2013) ("DSM-5"). The psychological evaluation references information from Appellant's school records recognizing that he "[h]as a physical or mental impairment that significantly impacts a major life activity and meets eligibility standards to be identified as having a Section 504 Disability." His impacted life activities listed were communication, concentration, learning, and thinking. Appellant therefore has

adaptive deficits satisfying the second element of the Supreme Court's test. *See Moore*, 137 S. Ct. at 1045; DSM-5 at 33; *see also* 19 Tex. Admin. Code § 89.1040(c)(5)(B). Appellant was and is still a minor; the third and final element of the Supreme Court's test is therefore met. *See Moore*, 137 S. Ct. at 1045. We agree with Appellant that this evidence is a prima facie showing of intellectual disability.

Despite Appellant's meeting the Supreme Court's test for intellectual disability, the psychologist concluded in the evaluation that Appellant is not mentally retarded. Intellectual disability is another term for mental retardation. *Brumfield v. Cain*, 576 U.S. 305, 135 S. Ct. 2269, 2274 n.1 (2015). Neither the juvenile court's order nor the rendition addresses this conflict in the evaluation, nor does either mention intellectual disability.

The evaluation does not explicitly base the psychologist's conclusion that Appellant has no intellectual disability on any evidence, but presumably she reached that conclusion based on her unsupported opinion in the evaluation that Appellant's low IQ test scores "are likely an underestimate of his intellectual and academic ability due [to] his approach[] (i.e. lack of effort toward answering items that he perceived as difficult)." Just as the evaluation contains no explanation for that opinion, the State did not offer evidence supporting it at the hearing, although we note that in a similar case, it has explored the issue extensively with both documentary evidence and live witnesses. *See In re E.O.*, No. 02-18-00411-CV, 2019 WL 2293181, at *4–5 (Tex. App.—Fort Worth May 30, 2019, no pet.) (mem. op.). There is no indication in the

26

record that the psychologist tested Appellant for malingering his intellectual disability, although such tests do exist. *See, e.g.*, *Ex parte Wood*, 568 S.W.3d 678, 680 (Tex. Crim. App. 2018), *cert. denied*, *Wood v. Tex.*, 140 S. Ct. 213 (2019); *Petetan v. State*, No. AP-77,038, 2017 WL 915530, at *20 (Tex. Crim. App. Mar. 8, 2017), *reh'g granted*, 2017 WL 4678670 (Tex. Crim. App. Oct. 18, 2017) (order, not designated for publication). Thus, an "analytical gap" exists between the data relied on and the psychologist's opinion that Appellant could have done better on the test. *See Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 726–27 (Tex. 1998). This gap renders her opinion unreliable and no evidence. *See Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 906 (Tex. 2004) (relying in part on *Gammill*, 972 S.W.2d at 726). Significantly, because the psychologist's opinion that Appellant could have done better on the IQ tests is the only basis in the record that we see for her conclusion that he is not intellectually disabled, that conclusion is likewise unreliable and no evidence because of an impermissibly wide analytical gap. *See Ramirez*, 159 S.W.3d at 906; *Gammill*, 972 S.W.2d at 726–27.

*Second*, although the psychological evaluation concludes that Appellant "appears capable of understanding the legal implications surrounding a discretionary transfer motion and of assisting his attorney in his defense," that conclusion is not tied to any evidence in the record. The juvenile court's like finding is therefore based on nothing but an unsupported conclusion. *See Moon*, 451 S.W.3d at 51 n.88. Again, the analytical gaps between the psychologist's conclusions and the facts she relied on

27

render her conclusions unreliable and no evidence. *See Ramirez*, 159 S.W.3d at 906; *Gammill*, 972 S.W.2d at 726–27.

*Third*, even if the psychologist's unsupported opinion that Appellant understands the legal significance of a transfer hearing and can help his attorney with his defense had evidentiary support in the record, the Texas Court of Criminal Appeals has stated in persuasive dicta that whether a juvenile can assist in his defense is irrelevant to whether he should be transferred to adult court:

> No case has ever undertaken to explain . . . exactly how the juvenile's capacity (or lack thereof) to . . . assist in his defense is relevant to whether the welfare of the community requires transfer, and we fail to see that it is. Other courts of appeals have rightly declared the purpose of an inquiry into the mental ability and maturity of the juvenile to be to determine whether he appreciates the nature and effect of his voluntary actions and whether they were right or wrong. In our view, [relying on] the juvenile's capacity to . . . help a lawyer to effectively represent him is almost as misguided as the juvenile court's logic in the present case when it orally pronounced that the appellant should be transferred, *inter alia,* merely for the sake of judicial economy, so that his case could be consolidated with that of his already-certified-as-an-adult co-defendant. Such a notion is the very antithesis of the kind of individualized assessment of the propriety of waiver of juvenile jurisdiction that both *Kent* and our statutory scheme expect of the juvenile court in the exercise of its transfer discretion.

*Moon*, 451 S.W.3d at 51 n.87 (citations and internal quotation marks omitted); *see also In re J.G.S.*, No. 03-16-00556-CV, 2017 WL 672460, at *4 (Tex. App.—Austin Feb. 17, 2017, no pet.) (mem. op. on reh'g). We note that the psychologist stated in the report that Appellant "is no more sophisticated or mature than his same aged peers." Fourteen-year-olds typically are neither sophisticated nor mature. How then could

Appellant's transfer be "the exception not the rule"? *Moon*, 451 S.W.3d at 36 (quoting *Hidalgo*, 983 S.W.2d at 754).

*Fourth*, in light of the prima facie evidence of Appellant's intellectual disability in the record, the facts of the crime the juvenile court relied on in its order are an insufficient basis for the finding that Appellant has sufficient sophistication and maturity for transfer. We recognize that capital murder is among the most serious of crimes; however we also recognize that nothing in the execution of this murder demanded maturity or sophistication. That is, it is not clear to this court how the evidence that Appellant, accompanied by a thirteen-year-old, was able to carry a loaded gun, kick an apartment door open, convince an unarmed person to give him her cell phone, shoot her when her back was turned, and dispose of the cell phone and his clothes shows that he had sufficient sophistication and maturity to be transferred to criminal court. Significantly, the detective in charge of the investigation testified that during the investigation he "had a pretty good feel that th[ese] offenses] . . . probably involved juveniles" because

> it's not real common that you see someone of the adults do something like this in just broad daylight in such a densely populated area where the chances of being seen are very high. Most of your adult burglars, by the time they get to that point, they're a lot more careful about it, where they go and how they approach things and . . . to me it just seemed very juvenile.

The record also shows that Appellant was essentially caught red-handed by proxy when, on the night of the murder, police found the adult of his small group was

carrying the murder weapon loaded with shells matching the casing found by the body. For all four reasons, we sustain this portion of Appellant's first point, and, because of this disposition, do not reach the rest of this point. *See* Tex. R. App. P. 47.1.

*****

This court recognizes that Appellant does not challenge the juvenile court's findings on all the Section 54.02 factors. But in this case, the juvenile court relied on all four factors and based its decision on both Appellant's background and the seriousness of the offenses, and we do not know how much weight the juvenile court accorded to each factor or to each of the two reasons for the transfer decision. We do know that evidence of intellectual disability means the difference between life and death in death-penalty cases. *Atkins v. Virginia*, 536 U.S. 304, 321, 122 S. Ct. 2242, 2252 (2002). At minimum, the evidence of Appellant's intellectual disability should have been explicitly addressed in the juvenile court's transfer order. The psychological evaluation does not sufficiently support the psychologist's conclusions that Appellant is not intellectually disabled. It offers no evidence to support her conclusion that his IQ test scores would have been better if he had tried to answer questions he found difficult, and it offers no evidence of how much better those scores would have been. Thus, the juvenile court's finding that Appellant is sufficiently sophisticated and mature to transfer to criminal court rests on insufficient evidence. Because intellectual disability may very well permeate Appellant's personal

30

history, his criminal history, and the likelihood of his rehabilitation, the trial court abused its discretion by basing its order on Appellant's background.  Because we cannot determine how much weight the trial court accorded Appellant's background versus how much weight it accorded the seriousness of the crimes in deciding to transfer him to criminal court, we must remand this case to the juvenile court.

### III.  Conclusion

Having overruled Appellant's constitutional complaints but having also held factually insufficient evidence supports the transfer order, we reverse the juvenile court's transfer order and remand this case to that court for proceedings consistent with this opinion.

/s/ Mike Wallach
Mike Wallach
Justice

Delivered:  April 2, 2020