

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. AP-77,107

**DAVID LEONARD WOOD, Appellant**

**v.**

**THE STATE OF TEXAS**

**ON DIRECT APPEAL FROM DENIAL OF MOTION FOR
FORENSIC DNA TESTING IN CAUSE NO. 58,486-171
FROM THE 171ST DISTRICT COURT
EL PASO COUNTY**

KELLER, P.J., delivered the opinion of the Court in which HERVEY, YEARY, NEWELL, KEEL, WALKER, SLAUGHTER and McCLURE, JJ., joined. RICHARDSON, J., did not participate.

## OPINION

Three young women and three teenaged girls disappeared from the El Paso area in the three and a half months between May 13, 1987 and August 27, 1987. Their bodies were later found buried in shallow graves. In 1992, Appellant was convicted of capital murder and sentenced to death for

killing these individuals. We affirmed his conviction and sentence on direct appeal in 1995.[1] Appellant filed a state habeas application in 1997, and we denied relief in 2001.[2]

Since that time, Appellant has litigated a second habeas application and has filed multiple motions (or amended motions) for DNA testing. The first DNA motion was granted in November 2010, and DNA testing was conducted in 2011. But the remaining DNA motions resulted in proceedings that stretched over a decade, with the trial court ultimately denying DNA testing on March 3, 2022. During that more-than-a-decade-long period, Appellant filed serial DNA motions that have requested testing on progressively more or different items, and he filed a number of ancillary motions, including motions to disqualify the trial judge and to disqualify the assistant attorney general serving as counsel for the State. And after the denial of DNA testing, Appellant sought to disqualify the assistant attorney general on the basis of a new legal theory. Appellant has appealed the 2022 denial of testing and now raises six issues, only two of which directly address the question of whether he should have been granted DNA testing of biological evidence.[3] Appellant has also filed several motions with this Court concurrently with his reply brief,[4] including a motion

---

[1] *Wood v. State*, No. AP-71,594 (Tex. Crim. App. December 13, 1995) (not designated for publication).

[2] *Ex Parte Wood*, No. WR-45,746-01 (Tex. Crim. App. Sept. 19, 2001) (not designated for publication).

[3] Before filing his brief, Appellant filed a motion asking for three things: (1) to abate for findings of fact, (2) to assign a new trial judge, and (3) to reassign the district attorney as the representative of the State. The requests in this motion duplicate issues raised and addressed in the appellate brief, and our disposition of his issues disposes of these requests as well. The motion is denied.

[4] After asking for and receiving extra time to file a reply brief, Appellant has filed a motion to exceed the word count by 3,500 words. We deny his motion. The reply brief has not been filed, because it exceeds the word count and we have not granted his motion, but we have "accepted" the

to certify one of our judges as "disqualified" and to have the Governor appoint a replacement judge for this case. Concluding that none of Appellant's issues have merit, we affirm the trial court's order. Our holdings include a determination that Appellant fails to meet the second prong of Article 64.03(a)(2): he has failed to show that his subsequent DNA testing requests have not been made to unreasonably delay the execution of sentence.[5]

## A. Absence of Findings of Fact

In issue one, Appellant contends that the trial court was required to issue findings of fact. We disagree.

Appellant did not request findings of fact from the trial court, so the issue here is whether the statute requires findings absent such a request.[6] Whether findings of fact are required depends on the construction of the statutory scheme set out in Chapter 64. We interpret a statute in accordance with the plain meaning of its text unless the text is ambiguous or the plain meaning leads to absurd results that the legislature could not have possibly intended.[7] In ascertaining the plain meaning of the text of an amended statute, "we consider the statutory language as if it had originally been enacted in its amended form, mindful that the Legislature, by amending the statute, may have altered

---

brief, similar to how we accept amicus briefs. *See Ex parte Taylor*, 36 S.W.3d 883, 887 (Tex. Crim. App. 2001). We have considered the contentions in that brief and have responded where appropriate.

[5] *See* TEX. CODE CRIM. PROC. art. 64.03(a)(2)(B).

[6] We need not decide whether Appellant would have been entitled to findings on request under *State v. Cullen*, 195 S.W.3d 696 (Tex. Crim. App. 2006). *See id.* at 700 (requiring a trial court, in the motion-to-suppress context, "to express its findings of fact and conclusions of law when requested by the losing party.").

[7] *In re Smith*, 665 S.W.3d 449, 460 (Tex. Crim. App. 2022); *Boykin v. State*, 818 S.W.2d 782, 785 (Tex. Crim. App. 1991).

or clarified the meaning of earlier provisions."[8]

Article 64.03(a) provides:

(a) A convicting court may order forensic DNA testing under this chapter only if:

(1) the court finds that:

(A) the evidence:

(i) still exists and is in a condition making DNA testing possible; and

(ii) has been subjected to a chain of custody sufficient to establish that it has not been substituted, tampered with, replaced, or altered in any material respect;

(B) there is a reasonable likelihood that the evidence contains biological material suitable for DNA testing; and

(C) identity was or is an issue in the case; and

(2) the convicted person establishes by a preponderance of the evidence that:

(A) the person would not have been convicted if exculpatory results had been obtained through DNA testing; and

(B) the request for the proposed DNA testing is not made to unreasonably delay the execution of sentence or administration of justice.[9]

Article 64.03(a)(1) sets out some circumstances that must exist in order for a court to order DNA testing.[10] It authorizes a court to order testing only if it "finds" that those circumstances do exist.[11] Subsection (a)(2) then requires the moving party to "show" by a preponderance of the evidence that

---

[8] *State v. Green*, 682 S.W.3d 253, 264 (Tex. Crim. App. 2024).

[9] TEX. CODE CRIM. PROC. art. 64.03(a).

[10] *Id.* art. 64.03(a)(1). Examples are that the evidence still exists and that there is a reasonable likelihood that it contains biological material suitable for DNA testing. *Id.*

[11] *Id.*

he would not have been convicted and that the motion is not to unreasonably delay the execution of sentence or administration of justice.[12] Subsection (c) then provides: "If the convicting court finds in the affirmative the issues listed in Subsection (a)(1) and the convicted person meets the requirements of Subsection (a)(2), the court shall order that the requested forensic DNA testing be conducted."[13] The only reference to a finding in the statute, then, is finding "in the affirmative" that the circumstances under Subsection (a)(1) have been established, as one step toward what is necessary to order DNA testing. There is no requirement that a court make findings if it determines that a person has failed to establish those matters.

This contrasts with Article 64.04, which requires that, after DNA testing, the trial court make a finding regardless of which way the issue is decided: "After examining the results of testing under Article 64.03 and any comparison of a DNA profile under Article 64.035, the convicting court shall hold a hearing and make a finding as to whether, had the results been available during the trial of the offense, it is reasonably probable that the person would not have been convicted."[14]

In asking that this Court remand for specific findings, Appellant relies on *Skinner v. State*[15] and on an unpublished order in *Reed v. State*[16] and argues that we should adopt the reasoning in those cases. We disagree for several reasons. First, *Reed* is unpublished and therefore is not

---

[12] *Id.* art. 64.03(a)(2).

[13] *Id.* art. 64.03(c).

[14] *Id.* art. 64.04.

[15] 122 S.W.3d 808 (Tex. Crim. App. 2003).

[16] No. AP-77,054, 2016 WL 3626329 (Tex. Crim. App. June 29, 2016) (not designated for publication).

binding, or even persuasive, authority.[17]  Second, Appellant's construction is contrary to the plain language of the Chapter 64 scheme as it existed at the time Appellant filed his motions (and as it exists today).

A relevant portion of Chapter 64 was previously worded differently than it is today and resulted in the statutory scheme being construed more in line with Appellant's contention.  Before 2003, Article 64.05 stated, "An appeal of a finding under Article 64.03 or 64.04 is to a court of appeals, except that if the convicted person was convicted in a capital case, the appeal of the finding is a direct appeal to the court of criminal appeals."[18]

In *Kutzner v. State*, we addressed whether an appeal could be made under the pre-2003 scheme from the denial under Article 64.03 of DNA testing on the basis of "conclusions" that Kutzner failed to meet the requirements of Article 64.03(a)(2).[19]  We observed that Senate Bill 3 (now codified as Chapter 64) as originally drafted did not authorize an appeal of any of the trial judge's Chapter 64 determinations.[20]  Later, by amendment, wording was added to allow appeal of "findings" under Article 64.04.[21]  Even later in the legislative process, the language was revised to

---

[17]  *See Skinner v. State*, 293 S.W.3d 196, 202 (Tex. Crim. App. 2009) (Rule 77.3 "prohibits the use of an unpublished opinion as authority of any sort, whether binding or persuasive."); TEX. R. APP. P. 77.3 ("Unpublished opinions have no precedential value and must not be cited as authority by counsel or by a court.").

[18]  TEX. CODE CRIM. PROC. art. 64.05 (West 2002).

[19]  75 S.W.3d 427, 432-35 (Tex. Crim. App. 2002).

[20]  *Id.* at 434.

[21]  *Id.*

authorize appeal of a "finding" under Article 64.03 or 64.04.[22]  In *Kutzner*, we read "findings" in Article 64.05 broadly, to include "conclusions of law."[23]  We said that this reading was necessary to avoid absurd results that would occur by treating people differently based on whether a trial court's determination was labeled a "finding" or a "conclusion."[24]

In *Skinner*, this Court addressed findings in a DNA motion that was denied under the pre-2003 scheme.[25]  There, the trial court's findings consisted merely of the general statement that the moving party failed to meet the requirements of Article 64.03.[26]  The Court suggested that "the trial court should provide determinations under the statute," that the trial court's general statement "may not be adequate in every case, and [that] this Court would appreciate more detailed findings from the trial court to facilitate our review."[27]  Nevertheless, under the circumstances of the particular case, this Court deemed the general statement to be "sufficient for the purposes of our review."[28]

But the statutory scheme in *Kutzner* and *Skinner* is not the scheme before us.  In 2003, the legislature amended Article 64.05 to delete the word "findings" and any references to Articles 64.03 and 64.04 and simply say, "An appeal under this chapter is to a court of appeals . . . ."[29]  Looking at

---

[22]  *Id.*

[23]  *Id.* at 434-35.

[24]  *Id.* at 435.

[25]  *See* 122 S.W.3d at 812-13.  Our records show that notice of appeal in *Skinner* was filed on August 1, 2002.

[26]  *Id.* at 812.

[27]  *Id.* at 813.

[28]  *Id.*

[29]  *See* TEX. CODE CRIM. PROC. art. 64.05 (current).

the language of statutory scheme afresh, without the "findings" language in Article 64.05, leads to the conclusion that not everything that is appealable in Chapter 64 is a finding and that the statute does not require a "finding" regarding denial of testing. In fact, the legislative change itself appears to be an acknowledgment that the word "finding" need not and should not be construed as broadly as it was in *Kutzner*.

Moreover, the requirement of a finding only if the trial court rules in the movant's favor is not irrational. An analogous situation occurs with respect to our factual sufficiency jurisprudence. When an appellate court *reverses* on factual sufficiency, it must "set forth in detail the evidence in the case along with its reasons for concluding that the jury's verdict was contrary to the evidence," but that requirement does not apply when an appellate court *affirms* on that issue.[30] The historical rationale for the "detail" rule for reversals seems to be based on the constitutional right to a jury trial and the consequent need to respect jury verdicts, which is not implicated when a court of appeals affirms a conviction.[31] A similar rule would seem rational in the post-conviction DNA testing context, to respect the finality of a judgment of conviction—requiring further proceedings only when circumstances dictate impinging on that finality interest. Requiring findings only when the trial court concludes that relief should be granted in the way of DNA testing would seem especially appropriate when, as here, the defendant has filed a subsequent motion for DNA testing.

Also, the types of findings required for DNA testing are frequently established one way or the other by undisputed evidence: Often, there are not conflicts about whether biological evidence still exists and is in a condition making DNA testing possible or whether that evidence has been

---

[30] *Roberts v. State*, 221 S.W.3d 659, 664-65 (Tex. Crim. App. 2007).

[31] *See id.*

subjected to a chain of custody sufficient to establish that it has not been substituted, tampered with, replaced, or altered in any material respect. Whether identity was or is an issue in the case generally depends on a review of the trial record.[32] Whether a person would likely have been convicted if exculpatory results had been obtained through DNA testing is ordinarily a legal question.[33] And whether the motion is made to unreasonably delay the execution of sentence or the administration of justice has been reviewed by looking at the defendant's conduct in litigating his DNA motion and any delays in doing so.[34] Regardless, nothing prevents an appellate court from concluding that the trial court should have granted DNA testing because it should have found in the convicted person's favor on the issues that would have entitled him to such testing.[35]

We conclude that the trial court was not required to make findings in support of its order denying relief. Issue one is overruled.

## B. Request to Remove the Trial Judge

In issue two, Appellant contends that this Court should assign a new judge to preside over

---

[32] *See e.g. Prible v. State*, 245 S.W.3d 466, 470 (Tex. Crim. App. 2008) (evidence of another person's DNA would not be exculpatory because of trial evidence).

[33] *See Ramirez v. State*, 621 S.W.3d 711, 723 (Tex. Crim. App. 2021) ("In making that determination, we do not consider post-trial factual developments. Instead, we limit our review to whether exculpatory results would alter the landscape if added to the mix of evidence that was available at the time of trial.") (citation and internal quotation marks omitted); *LaRue v. State*, 518 S.W.3d 439, 446 (Tex. Crim. App. 2017) ("Although there may be subsidiary fact issues that are reviewed deferentially, the ultimate question of whether a reasonable probability exists that exculpatory DNA tests would change the result on guilt-innocence is an application-of-law-to-fact question that does not turn on credibility and demeanor and is therefore reviewed de novo.").

[34] *See Reed v. State*, 541 S.W.3d 759, 778-80 (Tex. Crim. App. 2017); *Thacker v. State*, 177 S.W.3d 926, 927 (Tex. Crim. App. 2005). *See also infra* at nn.120-21 and accompanying text.

[35] *See* TEX. CODE CRIM. PROC. art. 64.05 (authorizing appeals under Chapter 64).

the Chapter 64 proceedings in the convicting court. He claims that Judge Richardson's participation in his case while campaigning for election for a seat on the Court of Criminal Appeals creates a constitutionally intolerable risk of bias. He also claims that Judge Richardson's participation in the case creates a risk of bias on our Court because Judge Richardson is a current judge on our Court. In a related motion filed in this Court, Appellant seeks to have this Court certify to the Governor that Judge Richardson is disqualified to hear the appeal so that the Governor can appoint a replacement judge for this case.

### 1. *Request to Remove from Trial-Level Proceedings*

Appellant points to the fact that Judge Richardson publicly announced his interest in the position on the Court of Criminal Appeals on July 20, 2013, while the *Atkins* and DNA proceedings were still pending. Appellant further avers that Judge Richardson ruled that Appellant was not intellectually disabled on October 4, 2013, just two days after formally declaring his candidacy. Appellant also points out that, less than a month before the March 2014 Republican primary, the campaign website included links to some news stories about cases that Judge Richardson presided over—including an article about the judge's denial of Appellant's intellectual-disability claim. Appellant says that the judge did not notify him, his attorney, or the State about the web-link.

Appellant says that these facts show that Judge Richardson was disqualified from presiding over Appellant's DNA proceedings on the basis of interest under both the Texas Constitution[36] and the Due Process Clause of the Fourteenth Amendment.[37] Appellant claims that, even if Judge

---

[36] TEX. CONST. art. V, § 11 ("No judge shall sit in any case wherein the judge may be interested . . .").

[37] U.S. CONST. amend. 14, § 1 (". . . nor shall any State deprive any person of life, liberty, or property, without due process of law . . .").

Richardson harbored no actual bias, the judge created "an appearance of impropriety and an impression of possible bias."

Judge Richardson was elected to the Court of Criminal Appeals in November 2014 and began serving on the Court in January 2015. However, he continued to serve as the trial judge on the DNA proceedings. Appellant filed a motion to disqualify Judge Richardson on April 18, 2017. Judge Stephen Ables, the presiding judge of the Sixth Administrative Judicial Region, denied that motion. The order denying the motion stated that Judge Ables found "nothing in the motion that would constitute a ground for disqualification under Texas law" and "that the Motion does not allege facts that can form the basis for an Order of Recusal."

A judge is "interested" for purposes of disqualification under the Texas Constitution only if "an order or judgment in the case will directly 'affect him to his personal or pecuniary loss or gain.'"[38] A "personal" interest is one "affecting the individual rights of the judge."[39] "The rule is likewise elementary that the interest sufficient to disqualify a judge from sitting in a case must be a direct, real, and certain interest in the subject matter of the litigation, not merely indirect or incidental or remote or contingent or possible."[40]

Under due process, a judge is subject to removal on the basis of a financial interest or a

---

[38] *Freedom Communications, Inc. v. Coronado*, 372 S.W.3d 621, 624 (Tex. 2012) (quoting from *Elliott v. Scott*, 119 Tex. 94, 99, 25 S.W.2d 150, 152 (1930)). *Accord State ex rel. Millsap v. Lozano*, 692 S.W.2d 470, 474 (Tex. Crim. App. 1985) (citing Blackstone for the proposition that "a judge was disqualified for direct pecuniary interest and for nothing else").

[39] *Love v. Wilcox*, 199 Tex. 256, 263-64, 28 S.W.2d 515, 518-19 (1930) (quoting an Alabama case).

[40] *Elliot*, 119 Tex. at 98, 25 S.W.2d at 151 (internal quotation marks omitted).

conflict of interest.[41]  The Supreme Court has recognized that a financial interest does not have to be quite as personal or direct as at common law, but it still requires a "conflict resulting from financial incentives."[42]  And there is a point at which a financial interest is "too remote and insubstantial" to violate due process.[43]  A non-financial conflict of interest can involve a judge's prior participation in an earlier proceeding.[44]  This prior-participation conflict of interest is akin to another basis for disqualification found in the Texas Constitution—"when the judge shall have been counsel in the case"[45]—but (in the due-process context) can extend to any type of prior participation that objectively poses a risk to the neutrality or disinterestedness of the judge.[46]  Whether a financial interest or a conflict of interest is at issue, due process forbids a judge from presiding over a case if doing so "would offer a possible temptation to the average man as a judge . . . not to hold the balance nice, clear and true between the State and the accused."[47]

Appellant has not shown that Judge Richardson had a direct pecuniary or personal interest in denying the motion for DNA testing, nor has he shown a substantial financial, non-remote interest in such a denial.  Appellant suggests that it was important to the judge's campaign, but the judge had already *won* that campaign over two years before Appellant even filed his motion to disqualify, and,

---

[41]  *See Caperton v. A. T. Massey Coal Co.*, 556 U.S. 868, 876-81 (2009).

[42]  *Id.* at 877-78.

[43]  *Id.* at 879, 884 (quoting from *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 826 (1986)).

[44]  *Id.* at 880.

[45]  *See* TEX. CONST. art. V, § 11.

[46]  *Caperton*, 556 U.S. at 880-83.

[47]  *Id.* (quoting from *Tumey v. Ohio*, 273 U.S. 510, 532 (1927)).

of course, the judge had not yet ruled on the DNA motion. A ruling on the DNA motion could not affect a campaign that was already over. If the claim is that a ruling on the DNA motion could affect a future campaign, such an effect is highly speculative and remote, and frankly, far-fetched. At the time Appellant filed the motion to disqualify, the next election would have been after the judge had served a six-year term on the Court of Criminal Appeals. It is fanciful thinking, at the least, to suppose that a ruling on a leftover trial assignment would have any significant effect in influencing voters to re-elect a judge who would have built a six-year record on the Court of Criminal Appeals. (And in fact, that election occurred, and Appellant has not suggested that Judge Richardson linked any of Appellant's proceedings on that campaign website.) And if we look at the claim in light of when the judge actually ruled on the DNA motion, the judge's next campaign would be after having built a twelve-year record on the Court of Criminal Appeals.

Judge Richardson did issue findings and a recommendation in the *habeas* action (on the intellectual-disability claim) before he was first elected to this Court. But the DNA motion proceeding is a separate proceeding from the habeas action, though both are related to (but separate from) the judgment of conviction.[48] It is a judge's interest in the *result* of the proceeding at issue, not any relationship that proceeding has with some other proceeding, that disqualifies a judge on the basis of interest under the Texas Constitution.[49] And even if we assume a more lenient due-process

---

[48] *See Cont'l Heritage Ins. Co. v. State*, 683 S.W.3d 407, 416 (Tex. Crim. App. 2024) ("A habeas corpus action is related to a criminal proceeding being attacked but is nevertheless considered to be a separate action."); *Smith v. State*, 559 S.W.3d 527, 536 (Tex. Crim. App. 2918) (observing that "a general notice of appeal filed after pronouncement of sentence would not invoke appellate jurisdiction over a later denial of a motion for DNA testing").

[49] *See Cameron v. Greenhill*, 582 S.W.2d 775, 776 (Tex. 1979) ("It is a settled principle of law that the interest which disqualifies a judge is that interest, however small, which rests upon a direct pecuniary or personal interest in the *result* of the case presented to the judge or court.")

standard, the intellectual-disability habeas action and the DNA proceedings involve widely divergent inquiries—whether an admitted serial killer should be spared the death penalty versus whether a convicted person might be innocent—and the political implications of those two types of proceedings are not necessarily the same.

And there is no conflict of interest flowing from the participation in multiple proceedings here. A trial judge of a convicting court is ordinarily *expected* to preside over any post-conviction litigation that occurs, including both habeas and DNA-motion proceedings.[50] The denial of relief in one post-conviction proceeding does not in itself impede a judge from continuing to preside over the convicted person's other post-conviction proceedings. And the act of placing a link to a media article about a judge's decision in one of the post-conviction proceedings does not by itself change that. The placement of the link could be seen as a reaffirmation of the correctness of the trial judge's decision, but that is not unusual or unexpected and does create a conflict between the proceedings.

Even as to the habeas action, any interest attributable to Judge Richardson was at most

---

(emphasis added); *Elliot*, 119 Tex. at 99, 25 S.W.2d at 152 (quoting from *City of Oak Cliff v. State*, 97 Tex. 391, 394, 79 S.W. 1068, 1069 (1904)) ("Where a judicial officer has not so direct an interest in the cause or matter as that the *result* must necessarily affect him to his personal or pecuniary loss or gain, then he may sit.") (emphasis added); *King v. Sapp*, 66 Tex. 519, 520, 2 S.W. 573, 573-74 (Tex. 1886) ("The law enumerates the only instances in which an interest not necessarily pecuniary will disqualify a district judge. These are where he has been of counsel in the cause, or where either of the parties may be connected with him by affinity or consanguinity, within the third degree. By naming those special cases where the judge's feelings may be interested, though he may not gain or lose by the event of the suit, the law, doubtless, intended to limit all other cases of interest to such as should be of a pecuniary nature. The judge must, by the judgment in the case, gain or lose something the value of which may be estimated. Of the influence which previously formed opinions upon questions involved in the case may have upon him, or the moral effect which his decision may have upon another judge presiding in other causes, the law takes no account.").

[50] Although Judge Richardson was not the original trial judge, he was appointed to preside over the post-conviction litigation.

indirect and insubstantial. Ordinarily, even a monetary campaign contribution does not create a direct and substantial interest, though it can, depending on the relative size of the contribution compared to the total amount of money in a judge's campaign.[51] Here, no money changed hands, much less a disproportionately large amount of money. And Appellant's habeas proceeding was only a part of the judge's record linked on his website. Any assistance to a campaign provided by publicity surrounding Judge Richardson's ruling in the habeas proceeding was speculative, remote, and intangible.

Moreover, Appellant's reasoning could conceivably apply to any judge who ran on his record. As the State points out, "If a judge cannot advise the public how he has ruled in particular cases for fear of being disqualified, the public would be left with scant information on which to base its vote." And a judge's record is always an issue that can arise in an election, whether the judge highlights it or not. An interest that would disqualify everyone is not a disqualifying interest at all.[52] Further, if the cases a judge rules on before he is elected can disqualify him, then only cases decided *after* he is elected to a different-level court are safe. Of course, that is *this* case, since the DNA motion was decided after Judge Richardson was elected (twice) to the Court of Criminal Appeals.

Relying on the Supreme Court case of *Caperton*, Appellant contends that "interest" must be interpreted to mean any situation "where a judge *appears* likely to be tempted to rule a certain way due to external factors." But while that case recognized recusal statutes and rules eliminating even the appearance of impropriety to be something to "take into account" when considering the reach of

---

[51] *Caperton*, 556 U.S. at 884.

[52] *See Lavoie*, 475 U.S. at 825 ("[A]ccepting appellant's expansive contentions might require the disqualification of every judge in the State. If so, it is possible that under a 'rule of necessity' none of the judges or justices would be disqualified.").

the Due Process Clause, it also emphasized that states are allowed to "adopt recusal standards more rigorous than due process requires" and that due process "demarks only the outer boundaries of judicial disqualifications."[53] Accordingly, the Supreme Court explained that the application of the Due Process Clause would be "confined to rare instances."[54] *Caperton* itself was an election case, and the Supreme Court found a due process violation only because the large monetary campaign contribution there exerted a "significant and disproportionate influence" that was "coupled with [a close] temporal relationship between the election and the pending case."[55]

Although Appellant alleges an appearance of impropriety, any appearance of impropriety that is not based on a substantial and non-remote interest necessary for disqualification goes only to recusal.[56] Appellant's motion in the proceedings below was for disqualification, not recusal. That may have been deliberate, because it is questionable whether a recusal motion filed two years after the judge was elected to the Court of Criminal Appeals would have been timely.[57] And Appellant

---

[53] *Caperton*, 556 U.S. at 888-89.

[54] *Id.*

[55] *Id.* at 886 (bracketed material inserted).

[56] *See* TEX. R. APP. P. 18b(b)(1).

[57] *See* TEX. R. APP. P. 18a(b)(1)(A) ("A motion to recuse . . . must be filed as soon as practicable after the movant knows of the ground stated in the motion"). The use of the word "must" for recusal motions contrasts with the use of the word "should" for disqualification motions. *See id.* 18a(b)(2) ("A motion to disqualify should be filed as soon as practicable after the movant knows of the ground stated in the motion."). This difference in wording suggests more leeway in filing disqualification motions. The Texas Supreme court has held that the constitutional disqualification of a judge in a proceeding can be raised at any time because it renders the actions of the judge void but that recusal is not fundamental error and can be forfeited. *In re Union Pac. Resources Co.*, 969 S.W.2d 427, 428 (Tex. 1998). We have likewise held that a ground for recusal can be forfeited. *Ex parte Thuesen*, 546 S.W.3d 145, 151 (Tex. Crim. App. 2017). Our Court has held that the ability to raise a constitutional judicial disqualification claim is not completely without limits—barring such

alleges only constitutional disqualification on appeal. In any event, the Regional Presiding Judge who decided the motion to disqualify ruled that it also did not allege facts showing a basis for recusal. We agree with that assessment for reasons we have already discussed. We see no impropriety in Judge Richardson linking portions of his judicial record on his website. And he had already won the election to higher court, so the ruling after he was elected could not have affected that election, and the idea that a leftover trial matter would have any significant effect on a subsequent election to a higher court is fanciful.

### 2. *Request to Remove from Direct Appeal Proceedings*

In his opening brief, Appellant also contends that Judge Richardson's decision to remain on the case even after being elected to our Court "rais[es] the specter of bias now that the other eight judges on this Court must review his Chapter 64 rulings." If that is a complaint about the other judges on the Court, Appellant did not file a motion to recuse the other members of this Court from participating in this case. Regardless, such a complaint would be without merit. From time to time, a judge on this Court will refrain from participating in a case before us because of involvement in an earlier phase of the case. That judge's status as a colleague does not somehow make the other judges biased or require their recusal. Because he was a judge at the trial level, Judge Richardson is not participating in the current appeal. That in no way prevents the remaining judges from fairly evaluating Appellant's appeal.

Concurrently with his reply brief, Appellant filed a motion with this Court to certify to the

---

a claim for the first time in habeas proceedings when the defendant was aware of the issue at trial and chose to proceed anyway. *See Ex parte Richardson*, 201 S.W.3d 712, 714 (Tex. Crim. App. 2006). In his reply brief Appellant suggests that his claim was made with reasonable diligence, but as we discuss later, we find that claim to be hollow. *See infra* at n.148 and accompanying text.

Governor that Judge Richardson is disqualified to participate in the case on appeal so that the Governor may appoint a replacement judge. Because he presided over the trial-level proceedings, Judge Richardson was never going to participate in this case on appeal. The issue here is whether this Court should ask the Governor to appoint a replacement judge under these circumstances.

The Texas Constitution provides:

> No judge shall sit in any case wherein the judge may be interested, or where either of the parties may be connected with the judge, either by affinity or consanguinity, within such a degree as may be prescribed by law, or when the judge shall have been counsel in the case. When the Supreme Court, the Court of Criminal Appeals, the Court of Appeals, or any member of any of those courts shall be thus disqualified to hear and determine any case or cases in said court, the same shall be certified to the Governor of the State, who shall immediately commission the requisite number of persons learned in the law for the trial and determination of such cause or causes.[58]

The constitutional language provides for certification to the Governor when a member of our Court is "thus disqualified." This language unambiguously provides that certification occurs only for disqualification under one of the grounds outlined in the state constitutional provision. Appellant bases his certification request on both the Texas Constitution and federal due process. But a federal due-process ground for removing a judge that does not also involve one of the state constitutional grounds does not trigger the certification requirement.

None of the state constitutional grounds apply here. Judge Richardson is not related by affinity or consanguinity to any of the parties in the case, and he was not an attorney for any of the parties in this case.

That leaves the question of whether he now qualifies as "interested" due to his position as the trial judge. Our sister court has answered that question "no." In *Galveston & H. Inv. Co. v.*

---

[58] TEX. CONST. art. V, § 11.

*Grymes*, the Texas Supreme Court held that the Texas Constitution did not prevent a judge who participated in a case in the court of civil appeals from again participating in the case in the Texas Supreme Court.[59] Pointedly, the Texas Supreme Court said, "The grounds of disqualification of the judges of the courts in this State are specified in the [Texas] Constitution and they are exclusive of all others; and the fact that a judge may have tried the case in a lower court or participated in the decision in such court is not made one of them."[60] This holding comports with other cases we have recited earlier, holding that "interest" under the Texas constitution refers to a pecuniary or personal interest in the outcome of the case. Any interest that a judge might have in his decision being upheld is neither of those.[61]

Appellant also relies upon a Government Code provision, which says:

(a) The fact that a judge of the court of criminal appeals is disqualified under the constitution and laws of this state to hear and determine a case shall be certified to the governor.

---

[59] 94 Tex. 609, 618, 63 S.W. 860 (1901) (op. on mot. for reh'g). *See also* Robert Calvert, *Disqualification of Judges*, 47 TEX. B.J. 1330, 1332 (December 1984).

[60] *Grymes*, 94 Tex. at 618 (bracketed material inserted).

[61] The Texas Supreme Court has also held that certification to the Governor need not occur if a quorum of an appellate court is available to hear the case and a majority can agree upon a decision. *Gwin v. O'Daniel*, 85 Tex. 563, 22 S.W. 876 (1893) (citing *Nalle, infra*) ("[W]hen one of the judges of the Court of Civil Appeals is disqualified, the other two members have jurisdiction, and may hear and determine the case. The fact of the disqualification need not be certified to the Governor, unless the two should be unable to agree."); *City of Austin v. Nalle*, 85 Tex. 520, 537-38, 22 S.W. 668, 671-72 (1893) ("It does not follow that an appointment is to be made in every such case. The requirement is, that the Governor 'shall commission the requisite number * * * for the trial and determination of such cause.' If three were required to make a quorum, then one being disqualified, another would be necessary to make the requisite number to decide the cause. So also, if one be disqualified and the other two disagree, the appointment of a special judge is requisite to enable the court to make a decision, although two may constitute a quorum. But if two be a quorum, and two be qualified and able to agree, no additional judge is requisite to a decision of the case, although the third member of the court be recused."). We need not address that issue here.

(b) The governor immediately shall commission a person who is learned in the law to act in the place of the disqualified judge.[62]

On the question of when certification to the Governor is required, the statute appears to merely codify what is in the Texas Constitution.[63] Specifically, the words "under the constitution and laws of *this state*" make clear that the state constitution, not the federal constitution, is controlling. And "laws" here appears to be a reference to the "affinity or consanguinity" basis for disqualification, because the Texas Constitution makes the determination of the familial relationship to be "within such a degree as may be prescribed by law."[64] We also keep in mind that we reasonably construe statutes to avoid a constitutional violation.[65] Reading the Government Code more broadly than the Texas Constitution on when certification is required could potentially violate the constitutional provision as well as the Separation of Powers provision.[66]

Consequently, we conclude that the certification to the Governor is not required if none of the three grounds for disqualification in Article V, Section 11 of the Texas Constitution apply. We further conclude that none of the three state constitutional grounds for disqualification apply.

---

[62] TEX. GOV'T CODE § 22.105.

[63] We need not address whether the statute conflicts with the Texas Supreme Court's holding that certification need not occur so long as a quorum and majority can decide the case. *See supra* at n.61.

[64] *See* TEX. CONST. art. V, § 11.

[65] *Ex parte Ingram*, 533 S.W.3d 887, 895 (Tex. Crim. App. 2017).

[66] *See State v. Stephens*, 663 S.W.3d 45, 56-57 (Tex. Crim. App. 2021) (violation of Separation of Powers for executive entity to exercise judicial duties not expressly assigned by the Texas Constitution); *Meshell v. State*, 739 S.W.2d 246, 254 (Tex. Crim. App. 1987) (violation of Separation of Powers for legislature to remove or abridge constitutional functions of an entity in another branch of government).

Consequently, we hold that certification to the Governor in this case is not required.

We overrule issue two, and we deny Appellant's motion to ask the Governor to appoint a replacement judge.

### C. Request to Remove the Assistant Attorney General

In issue three, Appellant contends that this Court should rescind the appointment of the assistant attorney general as attorney *pro tem* representing the State in these proceedings.

District Attorney Jaime Esparza had briefly been appointed to represent Appellant in his capital-murder prosecution. Esparza was soon removed because he had previously worked in the District Attorney's Office while the case had been under investigation. Esparza was elected District Attorney in November 1992 and served as District Attorney from 1993 through 2020. As the briefing deadline for Appellant's appeal approached in 1994, Esparza asked the trial court to recuse him and his office (due to his prior brief appointment as Appellant's attorney) and to appoint an attorney *pro tem* to represent the State on appeal.[67] A private attorney was appointed and served as the State's attorney for both the appeal and the first post-conviction habeas action. In 2008, that attorney indicated that he could no longer act as the State's attorney *pro tem*, and the trial court appointed an assistant attorney general to replace him.[68] That assistant attorney general represented the State in subsequent post-conviction litigation, including the habeas action raising the intellectual-

---

[67] *See* TEX. CODE CRIM. PROC. art. 2.07.

[68] The assistant attorney general who was appointed had filed the motion to substitute for the private attorney. The motion stated that "John Haughton, current counsel for Wood, is not opposed to this motion."

disability claim and the multiple motions for DNA testing.[69]

In December 2017, Appellant filed a motion to remove the assistant attorney general and appoint a new attorney *pro tem*. He claimed that the Attorney General's Office had withheld exculpatory information, and he called upon the trial court to exercise its authority under Article 2.07 to appoint and remove an attorney *pro tem*. The trial court denied that motion on March 3, 2022 when it denied DNA testing. More than two weeks later, on March 18, Appellant filed a new motion to remove the assistant attorney general. This new, *post-order* motion relied upon *State v. Stephens*, which had been handed down in December 2021,[70] and argued that Article 2.07, to the extent it allowed the appointment of assistant attorneys general as attorneys *pro tem*, violated the Separation of Powers Clause of the Texas Constitution. Appellant now makes the argument he made in his post-order motion.

### 1. *Preservation*

The lateness of Appellant's claim regarding the assistant attorney general prompts us to raise the issue of preservation. Preservation is a systemic issue that a first-tier appellate court must raise on its own before granting relief on a claim.[71] Most complaints are forfeited by a failure to object;

---

[69] On May 12, 2022, the Attorney General's Office filed a notice of appearance in this Court that designated a different assistant attorney general as the new attorney *pro tem* to represent the State on appeal. According to the Attorney General's filing, this was done pursuant to TEX. R. APP. P. 6.1(c), governing the designation of lead counsel on appeal. Appellant does not challenge this handoff of duties from one assistant attorney general to another, but even if he had, and even if we found the handoff to be invalid, we could accept the assistant attorney general's brief as an amicus brief. *See Taylor*, 36 S.W.3d at 887.

[70] 663 S.W.3d 45 (handed down December 15, 2021).

[71] *Darcy v. State*, 488 S.W.3d 325, 327-38 (Tex. Crim. App. 2016).

that is, they have to be preserved.[72]  A party is exempt from preservation requirements if the legal

issue is one that is waivable only or is an absolute requirement or prohibition.[73]  When a complaint

has to be preserved, the party raising the complaint on appeal must have complained to the trial court

in a timely fashion and stated the grounds for the ruling sought.[74]  The complaint at trial must match

the claim raised on appeal.[75]  "[A]ll a party has to do to avoid the forfeiture of a complaint on appeal

is to let the trial judge know what he wants, *why* he thinks himself entitled to it, and to do so clearly

enough for the judge to understand him at a *time* when the trial court is in a proper position to do

something about it."[76]

Several courts of appeals have held that a complaint about the appointment of an attorney *pro*

*tem* must be preserved.[77]  All of the complaints in these cases were based on the idea that the

---

[72]  *Moore v. State*, 295 S.W.3d 329, 333 (Tex. Crim. App. 2009).

[73]  *Burg v. State*, 592 S.W.3d 444, 448-49 (Tex. Crim. App. 2020).

[74]  TEX. R. APP. P. 33.1(a)(1)(A) (requiring a "timely request, objection, or motion" that states "the grounds for the ruling that the complaining party sought").  The complaining party must also obtain a ruling or object to the trial court's refusal to rule.  *Id.* 33.1(a)(2).  Appellant did not obtain a ruling on his motion.  He claims in his reply brief that he made efforts to get Judge Richardson to rule on his motion.  This claim is based on supposed emails to and from the judge that are not in the record.  Ironically, these emails are not included in Appellant's motion to supplement.  Nevertheless, we will assume, without deciding, that his claim is not barred by the ruling requirement.

[75]  *Butler v. State*, 872 S.W.2d 227, 236 (Tex. Crim. App. 1994).

[76]  *Rios v. State*, 665 S.W.3d 467, 476 (Tex. Crim. App. 2022) (quoting *Lankston v. State*, 827 S.W.2d 907, 909 (Tex. Crim. App. 1992)) (emphasis added).

[77]  *Hartsfield v. State*, 200 S.W.3d 813, 816 (Tex. App.—Texarkana 2006, pet. ref'd); *State v. Newton*, 158 S.W.3d 582, 588-90 (Tex. App.—San Antonio 2005, pet. dism'd); *Modica v. State*, 151 S.W.3d 716, 720-21 (Tex. App.—Beaumont 2004, pet. ref'd); *Marbut v. State*, 76 S.W.3d 742, 749-50 (Tex. App.—Waco 2002, pet. ref'd); *Stephens v. State*, 978 S.W.2d 728, 730 (Tex. App.—Austin, pet. ref'd).

appointment of the attorney *pro tem* was in violation of Article 2.07, the statute that authorized such appointments.[78]  Appellant, however, does not claim that the appointment violated the statute; he claims the statute authorizing the appointment violated the Texas Constitution.  But statutes are presumed to be constitutional, and that presumption means that a constitutional claim against a statute—even a facial claim—must be preserved at trial.[79]  There is an exception: if the statute has already been ruled facially unconstitutional in another case, a claim based on that unconstitutionality may be raised for the first time on appeal.[80]  But that exception is statute-specific unless the prior holding invalidating one statute would *automatically* invalidate a different statute.[81]  A defendant cannot use the holding of a case invalidating a statute to challenge an entirely different statute on the basis of a claim for extending that holding.[82]  That is what Appellant is trying to do here.  *Stephens* involved a challenge to a statute that purported to confer authority on the Attorney General's Office to unilaterally prosecute election law violations even when not requested by the district attorney who had authority to prosecute those violations.[83]  But the present claim involves a challenge to the constitutionality of a different provision that authorizes appointing an assistant attorney general to

---

[78]  *See supra* at n.77.

[79]  *Karenev v. State*, 281 S.W.3d 428, 434 (Tex. Crim. App. 2009).  *See also Ex parte Beck*, 541 S.W.3d 846, 852-53 (Tex. Crim. App. 2017) (applying the reasoning in *Karenev* to bar a constitutional challenge to a statute raised for the first time in a post-conviction habeas proceeding).

[80]  *Smith v. State*, 463 S.W.3d 890, 895-96 (Tex. Crim. App. 2015).

[81]  *Beck*, 541 S.W.3d at 857-60.

[82]  *Id.*

[83]  663 S.W.3d at 51-52, 55-57.

represent the State when the district attorney is disqualified or otherwise unable to serve.[84] The statute before us is at least in some ways narrower than the statute at issue in *Stephens* because it requires the disqualification or unavailability of the district attorney before someone in the Attorney General's Office can be appointed.[85]

Moreover, the considerations in favor of requiring preservation are even stronger here than in the court of appeals cases that bar unpreserved attorney-pro-tem claims and our cases that bar unpreserved facial constitutional challenges. In the court of appeals cases, the State initiated a prosecution or an appeal through the attorney *pro tem*.[86] In our facial-constitutional-preservation cases, the defendants were attacking the constitutionality of the statute proscribing the crime on which the prosecution was based.[87] In both types of cases, there was at least a colorable claim that the alleged infirmity undermined the entire basis of the prosecution. Here, however, *Appellant* initiated the current post-conviction proceeding by filing his motion for DNA testing. Appellant

---

[84] *See Beck*, 541 S.W.3d at 857-60 (Even though the statute that was previously held unconstitutional contained a common element with the statute that was being challenged, they were nevertheless different statutes.). Even in the context of an election-code prosecution, an assistant attorney general being appointed as attorney *pro tem* under Article 2.07 to represent the State after the district attorney has been disqualified presents a distinct question from the issue in *Stephens* of whether the Attorney General possessed an unqualified, unilateral ability to initiate election-code prosecutions.

[85] *See id.* at 859 ("This Court's holding that the online-solicitation provision in *Lo* was facially unconstitutional because of its sweeping breadth in prohibiting all titillating talk between adults and minors is not a binding judicial declaration that the improper-relationship statute, which applies much more narrowly to educational settings, is also unconstitutional. Given the differences between these two statutes and the distinct manner in which they operate, we agree with the court of appeals's assessment that this Court's holding in *Lo* did not automatically invalidate the improper-relationship statute.").

[86] *See supra* at n.77.

[87] *See Beck*, 541 S.W.3d at 850; *Karenev*, 281 S.W.3d at 429.

cannot advance even a colorable claim for undermining the basis for his proceedings, nor would he want to.[88] Given our discussion, it is obvious that the sort of claim Appellant advances must be preserved. If a convicted person thinks the wrong person is representing the State in responding to his motion for DNA testing, the convicted person must raise that issue to the trial court.

At best, Appellant's issue was raised late. Despite the fact that an assistant attorney general had been representing the State as an attorney *pro tem* in connection with DNA motions *since 2010*, Appellant first sought removal in late 2017. Even then, he did not raise the reason he now raises on appeal. His current complaint was not raised until *March 2022*—five years after his last DNA motion and over a decade after the DNA litigation had begun. Moreover, his current complaint was raised *after* the trial court had denied his motion for testing. Even assuming the trial court still had plenary power to grant Appellant's motion to disqualify, remove the attorney *pro tem*, and withdraw the order denying DNA testing,[89] a lot of events had happened that the trial court could not effectively undo. The trial court could not undo the amount of time and effort spent by the assistant attorney general for more than a decade on this case: agreeing to and arranging testing on some DNA evidence, reading Appellant's subsequent DNA motions and the other ancillary motions, and researching and responding to the various motions. The trial court also could not undo the amount of time it had spent reading and thinking about the material produced by the assistant attorney

---

[88] *See Karenev*, 281 S.W.3d at 436 n.8 (Cochran, J., concurring) (claiming that a facial challenge to a statute defining the offense should be immune to procedural default but acknowledging that facially "unconstitutional procedural statutes or evidentiary rules do not affect the jurisdiction of the court, its authority, or its power to render a judgment [and t]herefore, the failure to object in the trial court waives any appellate claim").

[89] *See Swearingen v. State*, 189 S.W.3d 779, 781 (Tex. Crim. App. 2006) (saying that trial court *might* have 30 days plenary power to rescind order denying testing).

general, as well as the time spent in hearings participated in by the assistant attorney general. And the trial court had a reasonable expectation that *finally* this litigation had been resolved—only for Appellant to suggest that the resolution should be undone on the basis of a claim he could have raised over a decade ago.

To the extent that Appellant responds that our decision in *Stephens* was recent, such a contention is hollow. *Stephens* itself was handed down months before the trial court issued the order denying DNA testing.[90] Even if *Stephens* were viewed as a triggering event for Appellant's claim, a motion filed after Appellant's case had been resolved is untimely.[91] But the date *Stephens* was handed down is itself too lenient a benchmark. The salient cases on which *Stephens* relied were *Saldano v. State*[92] and *State v. Rhine*,[93] decided by this Court in 2002 and 2009, respectively.[94] And the relevant constitutional provisions have been around for over a century. Nothing prevented Appellant from making a claim at the moment he first filed a motion for DNA testing, based on the salient authorities on which *Stephens* relied. Moreover, even if (1) Appellant's claim were timely in relation to *Stephens* and (2) the holding in *Stephens* were totally unanticipated, that still does not get Appellant off the hook. It has been the law for decades that the novelty of a claim does not

---

[90] The *Stephens* decision was not final when it was handed down, but it was not final when Appellant relied on it either. *See State v. Stephens*, 664 S.W.3d 293 (Tex. Crim. App. 2022) (denying rehearing on September 28, 2022).

[91] *See Buntion v. State*, 482 S.W.3d 58, 78-79 (Tex. Crim. App. 2016) (holding and citing cases holding that an argument presented for the first time in a motion for new trial was not preserved for review).

[92] 70 S.W.3d 873 (Tex. Crim. App. 2002).

[93] 297 S.W.3d 301 (Tex. Crim. App. 2009).

[94] *Stephens*, 663 S.W.3d at 49.

exempt it from preservation requirements.[95]  Appellant failed to preserve his claim.

## 2. *Merits*

But even if Appellant's claim had been preserved, it would be without merit.  In *Stephens*, we held that the Attorney General could not unilaterally exercise a prosecution power that was assigned to the judicial department.[96]  We explained that the power to prosecute was constitutionally conferred within the judicial department to district and county attorneys.[97]  We further explained that the Attorney General can participate in criminal litigation if the relevant district or county attorney consents.[98]

When District Attorney Esparza sought to recuse himself and have an attorney *pro tem* appointed, he *consented* to someone other than the elected district attorney or his subordinates to try the case.  That would include an assistant attorney general, an option listed in the pre-2019 version of Article 2.07.[99]  Moreover, any attorney who acts as an attorney *pro tem* stands in the shoes of the district or county attorney being replaced.[100]  So the appointed attorney *pro tem* acts not with any

---

[95]  *Sanchez v. State*, 120 S.W.3d 359, 365, 367 (Tex. Crim. App. 2003) ("[T]his 'right not recognized' doctrine is inconsistent with our current law of error preservation. . . .The 'right not recognized' exception to the contemporaneous-objection rule relates to a kind of fundamental error . . . that *Marin* generally eliminated from our jurisprudence.") (referring to *Marin v. State*, 851 S.W.2d 275 (Tex. Crim. App. 1993)).

[96]  663 S.W.3d at 47.

[97]  *Id.* at 50.

[98]  *Id.* at 55-57.

[99]  *See* TEX. CODE CRIM. PROC. art. 2.07(f)(effective September 1, 1999).

[100]  *Coleman,* 246 S.W.3d 76, 82 (Tex. Crim. App. 2008) ("The attorney pro tem stands in the place of the regular attorney for the state and performs all the duties the state attorney would have performed under the terms of the appointment.").

authority he has by virtue of his original employment (e.g., in the Attorney General's Office) but uses the elected district or county attorney's authority conferred by the appointment.[101] Moreover, under the pre-2019 version of Article 2.07, which applied at the time the assistant attorney general was appointed in this case, the trial court was empowered to appoint "*any* competent attorney,"[102] which *included* an assistant attorney general,[103] so the fact that a particular appointed attorney was employed by the Attorney General's Office seems entirely irrelevant to the authority being exercised by the attorney *pro tem.*[104]

Because Esparza remained district attorney through 2020, the District Attorney's Office remained disqualified until 2021. But even when a new non-disqualified district or county attorney takes office, the attorney *pro tem* retains authority to complete the subject of the appointment unless that appointment is modified or revoked.[105] Notably, Appellant never argued to the trial court that the assistant attorney general should have been removed because the district attorney's

---

[101] This would be true in *any* type of case, even election-code prosecutions.

[102] TEX. CODE CRIM. PROC. art. 2.07(a) (effective September 1, 1999) (emphasis added); *Coleman v. State*, 246 S.W.3d at 81 (emphasis added).

[103] TEX. CODE CRIM. PROC. art. 2.07(f) (effective September 1, 1999) ("'competent attorney' includes an assistant attorney general").

[104] The 2019 amendment limited the attorneys who could be appointed to, "from any county or district, an attorney for the state or . . . an assistant attorney general." *See* TEX. CODE CRIM. PROC. art. 2.07(a) (effective September 1, 2019). In his reply brief, Appellant contends that "[o]nly the second category of attorneys eligible for appointment as an attorney *pro tem*—"an assistant attorney general"—encompasses attorneys who are *not* members of the judicial branch. But as our discussion shows, that statement is true for the *current* post-2019 version of Art. 2.07 but is not true for the version in effect at the time the assistant attorney general was appointed.

[105] *Coleman*, 246 S.W.3d at 83 ("[T]he appointment of an attorney pro tem lasts until the purposes contemplated by that appointment are fulfilled."), 85-86 (rejecting claim that appointment of attorney *pro tem* ended automatically when non-disqualified district attorney assumed office).

disqualification no longer existed.[106]  So the assistant attorney general continued to validly serve as the attorney *pro tem*.

Issue three is overruled.

### D. Loss or Destruction of Evidence

In issue four, Appellant contends that the State lost or destroyed over a dozen pieces of potentially exculpatory biological evidence and that we should sanction the State in this DNA motion proceeding.  In September 2016, he filed with the trial court a "Motion to Mitigate Harm Caused by the State's Loss or Destruction of Potentially Exculpatory Biological Evidence." On March 3, 2022, the trial court denied this motion.

Appellant claims that we have "the authority under Chapter 64 to craft an appropriate remedy to deter such conduct by the State in the future and to mitigate the harm its actions have caused David Wood's ability to prove his innocence."  We disagree.

Notably, Appellant cites no authority for the claim that we can fashion the remedy he seeks in a Chapter 64 proceeding.  And our cases are clear that the remedy in Chapter 64 proceedings is limited to obtaining DNA evidence and then findings based on any test results.  "Chapter 64 is simply a procedural vehicle for obtaining certain evidence which might then be used in a state or federal habeas proceeding."[107]  "[T]he evident legislative purpose behind Chapter 64 . . . was to

---

[106]  Had he done so, the equities would have strongly supported retaining the assistant attorney general because of the time and effort he had spent in this case and the burden that would be placed on any new attorney to get up to speed.  *See id.* at 85 (concluding that the various factors supported the trial court's decision to retain the attorneys *pro tem*, including that "the two attorneys pro tem had spent over twenty-one months researching, investigating, and preparing this case for a trial that was then imminent").

[107]  *Ex parte Gutierrez*, 337 S.W.3d 883, 890 (Tex. Crim. App. 2011).

provide a convicted person who is eligible under its terms with an avenue for obtaining post-conviction forensic DNA testing—and no more," other than "a favorable finding of fact" if DNA testing occurs and exculpatory results are obtained.[108]

Nothing in any of the statutes in Chapter 64 suggests that a remedy can be imposed for the State's destruction of evidence.[109] In fact, the opposite is true. Under Article 64.03, a court "may order forensic DNA testing under this chapter *only if*," among other things, "the evidence . . . *still exists* and is in a condition making DNA testing possible."[110]

And we have rejected the notion that constitutional principles require a court to "consider claims under a remedial statute that are not authorized by the language of that statute."[111] "Quite the opposite: if the statute is what creates the remedy, and the claim at issue does not qualify under the statute, then the court is prohibited from granting relief under the statute."[112] Chapter 64 creates a remedy only for evidence that does exist—authorizing testing if certain conditions are met. Chapter 64 does not authorize a remedy for evidence that no longer exists because the State destroyed it. To complain about the State's destruction of evidence in a post-trial setting, when a motion for new trial is no longer an option, a convicted person must file a habeas application.[113]

---

[108] *State v. Holloway*, 360 S.W.3d 480, 487-88 (Tex. Crim. App. 2012), *overruled on other grounds by Whitfield v. State*, 430 S.W.3d 405, 409 (Tex. Crim. App. 2014).

[109] *See* TEX. CODE CRIM. PROC. art. 64.01, *et seq.*

[110] TEX. CODE CRIM. PROC. art. 64.03(a)(1)(A)(i) (emphasis added).

[111] *Ex parte White*, 506 S.W.3d 39, 51 (Tex. Crim. App. 2016).

[112] *Id.*

[113] *See e.g., Ex parte Napper*, 322 S.W.3d 202, 227-40 (Tex. Crim. App. 2010).

Issue four is overruled.

## E. Denial of DNA Testing on Biological Evidence

In issue five, Appellant contends that the trial court erred in denying his "motion for DNA testing of multiple pieces of evidence collected from the six crime scenes." In issue six, he contends that the trial court erred in denying his motion for DNA testing of biological samples collected from Salvador Martinez, whom Appellant terms an "alternative suspect." For reasons we will discuss shortly, we address these issues together.

### 1. *Alternative Suspect*

The State contends that Chapter 64 does not authorize the testing of samples from an alternative suspect. Article 64.01 specifies that a convicted person may request DNA testing "only of evidence described by Subsection (a-1) that was secured in relation to the offense that is the basis of the challenged conviction and was in the possession of the state during the trial of the offense."[114] Subsection (a-1) refers to "evidence that has a reasonable likelihood of containing biological material."[115] "Biological material" is defined as "an item that is in possession of the state and that contains blood, semen, hair, saliva, skin tissue or cells, fingernail scrapings, bone, bodily fluids, or other identifiable biological evidence that may be suitable for forensic DNA testing" and "includes the contents of a sexual assault evidence collection kit."[116]

These statutes make clear that a convicted person cannot require the State to collect biological material that it does not already possess. So, the State could not be required to collect

---

[114] TEX. CODE CRIM. PROC. art. 64.01(b).

[115] *Id.* art. 64.01(a-1).

[116] *Id.* art. 64.01(a).

DNA samples from an alternative suspect to test them. But as will be explained later, the State had already collected samples from Martinez. What is unusual about the motion to test these samples is that it relates to biological material collected from a known individual with the idea of obtaining that individual's DNA profile instead of biological material of unknown origin collected from the victim or the crime scene. But it is not immediately self-evident that the literal text of the statute would not embrace Appellant's request.

We will assume, without deciding, that the samples from Martinez qualify as evidence that could be tested under Chapter 64 if other requirements are met. But because the motion to test these samples is markedly different from the more conventional crime-scene DNA motions that Appellant has filed, we will refer to the Martinez-samples motion as the "alternative suspect" motion rather than trying to fit it within the numerical sequence of Appellant's DNA motions. We will refer to each of Appellant's crime-scene DNA motions as a "motion for DNA testing" or a "DNA motion" and to the numerical sequence that the particular crime-scene motion was filed. That means we will refer to Appellant's fourth crime-scene motion more generally as his fourth DNA motion, even though the "alternative suspect" motion was filed between it and Appellant's third DNA motion. We now address whether the relevant requirements have been met with respect to all of the items Appellant wishes to test.

## 2. *Unreasonable Delay*

Article 64.03(a)(2)(B) requires a convicted person to establish "by a preponderance of the evidence that . . . the request for the proposed DNA testing is not made to unreasonably delay the execution of sentence or administration of justice."[117] The statute "does not contain set criteria a

---

[117] TEX. CODE CRIM. PROC. art. 64.03(a)(2)(B).

court must consider in deciding whether a movant satisfied his burden that his request is not made to unreasonably delay a sentence's execution," but circumstances that may be considered include "the promptness of the request, the temporal proximity between the request and the sentence's execution, or the ability to request the testing earlier."[118] But cases will "turn on the discrete facts" they present and there is "no definitive criteria for answering this inherently fact-specific and subjective inquiry."[119]

In *Reed*, we concluded that the convicted person failed to establish that his request was not made to unreasonably delay the execution of his sentence or the administration of justice because he untimely requested testing of a significant number of items, took four months to submit his own reference sample, engaged in protracted litigation since his conviction was affirmed in 2000, took a "piecemeal" approach to his post-conviction litigation, filed his motion on the same day the judge held a hearing on a request to set an execution date, and waited thirteen years after Chapter 64 was first enacted to file his motion for DNA testing.[120] In *Thacker*, we held that the convicted person failed to make the required showing because he "waited over four years to file his motion, and that motion was filed less than a month before his scheduled execution."[121] The record convinces us that Appellant has failed to meet his burden here—a conclusion that is amply supported by the timeline of events we detail below.

Because Appellant was convicted in 1992, he has had the entire time that Chapter 64 has

---

[118]  *Reed*, 541 S.W.3d at 778.

[119]  *Id.*

[120]  *Id.* at 778-80.

[121]  177 S.W.3d at 927.

been in existence—since April 5, 2001—to file a motion for DNA testing.[122] In 2009, Appellant was granted a stay of execution so that he could raise an *Atkins* intellectual-disability[123] claim.[124] In November 2010, Appellant filed his first motion for DNA testing, which sought testing under a newer method (Y-STR) of three pieces of biological evidence (including a fingernail) that had been previously tested under an older method.[125] Appellant alleged that Y-STR testing "was not available for forensic use until at least 2003." In our 2005 *Thacker* opinion, we noted that Thacker claimed that Y-STR did not become available until 2002.[126] We faulted Thacker for not filing a motion for DNA testing "in 2002, 2003, or 2004."[127] Regardless of whether Y-STR testing was available in 2002 or 2003, Appellant waited even longer than Thacker to file his motion. Nevertheless, the State did not oppose the motion, and the trial court granted it.

Concurrently with the first DNA motion, Appellant requested that the *Atkins* proceeding be stayed pending the outcome of the DNA testing. The trial judge did not agree to a stay but did extend all of the deadlines pertaining to the *Atkins* proceeding by 90 days.

In January 2011, the DNA and habeas proceedings were transferred from Judge Peter Peca to Judge Bert Richardson. In February 2011, Appellant filed a second motion for DNA testing,

---

[122] *See Reed*, 541 S.W.3d at 779 & n.41.

[123] *See Atkins v. Virginia*, 536 U.S. 304 (2002).

[124] *Ex parte Wood*, No. WR-45,746-02, 2009 WL 10690712, at *1 (Tex. Crim. App. Aug. 19, 2009) (not designated for publication).

[125] The fingernail was from the victim Angelica Frausto.

[126] 177 S.W.3d at 927.

[127] *Id.*

seeking the testing of four additional fingernails. He stated that his attorney learned of the existence of these fingernails in the State's possession on January 29, 2011, but Appellant did not explain why he could not have discovered their existence earlier.[128] He claimed that the motion was not made to unreasonably delay the execution of his sentence because he did not have an execution date set and "[t]esting of these items should proceed efficiently and quickly." And concurrently with his new testing request, Appellant filed a motion to further extend the deadlines in the *Atkins* proceeding.

Testing of the three items from Appellant's first DNA motion was later completed. The test results showed that a bloodstain on a yellow terrycloth sun suit belonging to victim Dawn Smith contained male DNA. A partial profile of this DNA was developed, and Appellant was excluded from this profile. In August 2011, the trial court issued an order finding that the results did *not* establish that it is reasonably probable that Appellant would not have been convicted.[129]

In October 2011, Appellant filed a third motion for DNA testing. This time, he sought to test more than 69 items, none of which had previously been subjected to DNA testing.[130] At the beginning of his argument in the motion, Appellant explained that, after the 2011 amendments,

---

[128] Like the first fingernail tested, these fingernails were also from the victim Frausto but were not previously tested because, unlike the fingernail that was tested, a visual inspection revealed no tissue underneath them. Appellant argued that the technology that existed when he was convicted in 1992 had not been capable of providing probative results. Opposing the second DNA motion, the State contended, among other things, that Appellant had not shown that there was biological material on the fingernails that could be tested. Appellant responded that the State had argued at trial that scratches on Appellant's face were inflicted by the victim to whom the fingernails belonged. So, Appellant surmised that microscopic biological material from another person could be on the fingernails. That surmise is problematic because it assumes Appellant's guilt. If the scratches on Appellant's face were of innocent origin, they could not be used to infer the likelihood of microscopic DNA existing on the victim's fingernails.

[129] Appellant filed a notice of appeal of that determination, but he subsequently withdrew it.

[130] He enumerated 69 entries, but some of his entries consisted of multiple items.

"Chapter 64 no longer burdens a convicted person with demonstrating why evidence was not previously tested." Appellant did not use this point to support his contention later in the motion that his motion was not made to unduly delay his execution, and he did not explain why these items could not have been brought in an earlier motion.[131] In support of his contention that the motion was not made for purposes of delay, Appellant stated that no execution date had been set and that the parties were continuing to litigate the *Atkins* claim. Neither of these reasons explained why he could not have brought his request earlier.

The 2011 version of Chapter 64 still required that the items to be tested "contain[] biological material."[132] Only a few of the 69 items listed in the motion—consisting of fingernails or containing hair—obviously consisted of or contained biological material.[133] The vast majority of the items (e.g. shirts, pants, shoes, cigarette butts) did not self-evidently contain biological material, and Appellant did not attempt to explain why he thought they did, other than to rely upon the generalization that "[m]odern technology can identify male DNA from the mere traces of blood, skin cells, sweat, semen, or mucus left on a variety of surfaces."

In a December 2011 hearing, the trial judge remarked that Appellant was seeking testing on an "extraordinary amount of evidence." It became clear at the hearing that the defense did not even

---

[131] Pointedly, Appellant did not argue that he could not show, under the pre-2011 statute, that the failure to test these items for his trial was not his fault. *See* TEX. CODE CRIM. PROC. art. 64.01(b)(1)(B) (West 2002) ("through no fault of the convicted person, for reasons that are of a nature such that the interests of justice require DNA testing"); *Skinner v. State*, 293 S.W.3d 196, 197 (Tex. Crim. App. 2009) ("[T]he interests of justice do not require testing when defense counsel has already declined to request testing as a matter of reasonable trial strategy.").

[132] TEX. CODE CRIM. PROC. art. 64.01(a-1) (West 2012).

[133] And the fingernails were obviously biological material because they came from victims, not because they obviously contained biological material from a third party.

know whether these items contained biological material and that eyeballing the items would not help

because any biological material would be, according to Appellant's habeas counsel, "microscopic."

At some point in the hearing, Appellant's habeas counsel suggested that DNA testing could occur

a little bit at a time:

> [T]he Court doesn't have to order all of the items to be tested immediately. A technical scientific expert can advise the Court as to the first five or ten items to test and make a determination at that point after testing is completed, whether it is dispositive, then we can move on in stages.

The trial judge reacted negatively to that suggestion:

> I think if there is something to test, we're just going to do it all and get this over with. So, if Mr. Wood is entitled to relief, he gets it and we're done with it, if he's not, then we just go to the next step. I'm opposed to dragging this thing out any longer than it should have been. You know, I've reviewed the hearings from August of 2009, and back at that time there was a request that this take place in about nine months. That's what you requested and the Judge denied it, that request. We're two and a half years into this almost.

Later, the trial judge told the State, "I agree with you on the delays. I'm somewhat exa[sper]ated on

how long this has taken." The judge specifically attributed unwarranted delay to habeas counsel:

> I think the record is clear about what I think about the delays here that have taken place, including the Court's threat to hold you in contempt. Previous deadlines warrant that. So I think it's abundantly clear that there have been deadlines missed, that there have been delays, and we've concluded the *Atkins* hearing.

Nevertheless, the trial judge appointed Dr. William Watson to assist Appellant in determining what

evidence might be available for testing.[134]

The record shows no further actions by Appellant with respect to his remaining DNA motions

---

[134] According to the trial judge, Dr. Watson was willing to do so without charging a fee.

until January 2015, after this Court had denied relief on his *Atkins* habeas claim (November 2014)[135] and after the State had asked for an execution date to be set. Appellant filed a written document opposing the setting of an execution date on the ground that he "has been diligently litigating his right to DNA testing on nearly 100 items found at the crime scenes." In a supplemental document opposing an execution date, Appellant set out a chronology of events spanning 2011 to 2015 that he claims are substantiated by emails between the parties, experts, and the trial court. This chronology claimed that Dr. Watson was appointed in March 2012 and outlines various events during the next few years. Even so, the chronology contained unexplained gaps, with nothing occurring between July 2012 and October 2013 or between October 2013 and March 2014.

In April 2015, Appellant filed a motion to "order" DNA testing, which appears to have been a follow up to his third motion for DNA testing. In this follow-up motion, Appellant claimed that Allison Heard, a DNA supervisor at the Department of Public Safety's Austin Crime Lab, had designated a list of at least 39 items that would benefit from DNA testing.[136]

On November 2, 2015, Appellant filed a motion to create a DNA profile of Salvador Martinez, whom Appellant called an "alternative suspect." In this "alternative suspect" motion, Appellant said that El Paso police officers had interrogated Martinez in 1987 in relation to the murders and had collected hair, saliva, and blood samples from him. Appellant further claimed that the police sent these samples to the Department of Public Safety for testing but that they were never tested. Appellant claimed that his request for testing was not made to unreasonably delay his

---

[135] *Ex parte Wood*, No. WR–45,746–02, 2014 WL 6765490 (Tex. Crim. App. November 26, 2014) (not designated for publication).

[136] The list contains 39 entries, but some of those entries consist of multiple items.

execution or the administration of justice because there was no execution date pending and because he intended to file a new DNA motion based on amendments that became effective on September 1, 2015. He provided no explanation for why the 2015 amendments excused the more-than-a-decade delay in requesting this testing.

In its response to Appellant's "alternative suspect" motion, the State contended, among other things, that Appellant failed to show that his motion was not made to unreasonably delay the execution of sentence or the administration of justice. Appellant filed a reply claiming that it would not have mattered if he had filed his motion earlier because the 2015 amendment created a "far more lenient" testing standard than had previously existed by authorizing testing when there was a "reasonable likelihood" an item contained biological material, as opposed to showing that an item did in fact contain biological material.[137] That response made no sense in the context of Appellant's "alternative suspect" motion because the biological samples taken from Martinez were necessarily biological material, and the whole point of Appellant's request was to obtain *Martinez's* DNA profile.

---

[137] The exact language in Appellant's reply was as follows:

> Furthermore, the State admonishes Mr. Wood for failing to file the alternative-suspect DNA motion shortly after the Court noted that it was considering setting an execution date. However, doing so would not have aided in avoiding further delays in this case. On May 22, 2015, Texas Governor Greg Abbott signed a bill to amend the Chapter 64 DNA testing statute. The law did not take effect until September 1, 2015. The amendment permits defendants to obtain DNA testing if they can show that the evidence to be tested has a "reasonable likelihood" of containing biological material. This standard is far more lenient than the previous standard. Thus, if Mr. Wood had filed the alternative-suspect DNA motion prior to September 1, 2015, he would have had to re-file the motion after the amended statute took effect for the new provisions to apply.

(Citations omitted).

From May 2015 to January 2016, Appellant filed several other motions, including a motion to order the State to locate missing trial exhibits, a motion to re-file the DNA motion after September 1, 2015, a motion for the appointment of Chapter 64 counsel, and a motion to unseal evidence.

In a February 2016 hearing, the trial judge commented again about delays in the proceedings: "I think my findings are quite clear about the delays that have taken place in the case. And it's my opinion at this point, it's inexcusable." The trial judge did, however, suggest that the defense was not dilatory after the passage of the 2015 amendments to Chapter 64. Appellant's habeas attorney further argued that the State was not making a "fair accusation" in accusing the defense of "piecemeal litigation." The trial judge responded, "I think it's a fair accu—representation because I put it in my findings" and further elaborated:

> This was remanded back to El Paso in August of 2011 for an Atkins hearing. During that time period, you agreed to DNA testing along with the State to get done. It got done. I ruled on it and then subsequent to that, there [were] more requests for DNA testing. So it has been piecemealed. Whether it's dilatory or not, I'll just make that finding at the appropriate time but it has been piecemealed. There's no question about it.

The trial judge subsequently questioned Appellant's habeas counsel on whether the defense did anything during the years to move the case, and habeas counsel did not give a responsive answer:

> THE COURT: So we concluded the Atkins matter and the DNA matter in late 2011 I believe.
>
> [HABEAS COUNSEL]: That's correct. I'm sorry.
>
> THE COURT: Were there any subsequent requests to anybody that you wanted more information pursuant to the DNA issues? I know I assigned -- I appointed an expert to take a look at it but most of that movement seems to come when I would make a phone call and see if there's any movement going on. There wasn't any request to come back to El Paso or anything for DNA matters. That was from your end.
>
> [HABEAS COUNSEL]: I know, Your Honor, but the appointment of that expert, the

Court's expert and he was initially appointed --

THE COURT: At your request. You wanted an expert.

[HABEAS COUNSEL]: Right, and --

THE COURT: Correct?

[HABEAS COUNSEL]: -- that's the Court's independent neutral expert --

THE COURT: Right.

[HABEAS COUNSEL]: Dr. Watson who was to report back to you --

THE COURT: Uh-huh.

[HABEAS COUNSEL]: -- about the existence of biological material on the evidence that was contained in the 2000 motion -- 2011 motion for DNA testing.

THE COURT: Okay.

[HABEAS COUNSEL]: My point is it would have been extremely helpful to -- if I had been given a copy of this September 2011 exhaustive comprehensive catalog inventory list from the DPS expert. I didn't have that and therefore when we did finally get a copy of it and received it not until last year. We recived a legible color copy of that document. And until we clearly read the spreadsheet did we realize there were a number of items that previously were not known to us based on the 1989 spreadsheet we were working on.

The trial judge later tried to nail down whether all the evidence that the defense wanted tested was accounted for:

THE COURT: Are all of the items that you're requesting to be tested, are they on these spreadsheets? Are those from the victims in the case and not extraneous items or do we know?

[HABEAS COUNSEL]: They're from the victims. They're from the crime scene as far as we can tell.

The trial judge further discussed the need to have a list of all the evidence the defense was seeking to have tested and for the defense to then file a new motion for DNA testing based on that evidence:

> Put it all together. Say this is everything that could potentially be tested and then [habeas counsel] can file his motion saying I would like all of it tested, which I presume is what he will do and then you can either agree or just object to it. And if we have to come back for that, we can do that.

The trial judge granted Appellant's motion to make habeas counsel his appointed attorney, and the trial judge ordered that the El Paso Police Department allow habeas counsel and his agents to inspect and take photographs of any evidence in the case and to make copies of any documentary evidence.

From July 2016 to January 2017, Appellant filed several motions, though none were the anticipated post-2015 motion for DNA testing. He filed a motion for clarification, a motion to compel the Attorney General to disclose evidence of a Crime Stoppers tip of an alternative suspect (*not* Martinez), a motion to mitigate harm caused by the State's loss or destruction of potentially exculpatory biological evidence, a motion to compel the State to disclose correspondence between the State and a jailhouse informant, and a motion to compel disclosure of exculpatory evidence related to police misconduct.

More than a year after the 2016 hearing, in March 2017, Appellant filed the anticipated fourth motion for DNA testing, titled as being under "Amended Chapter 64." Attached to the motion was a "DNA spreadsheet" listing 142 entries. None of these items had previously been tested. Although Appellant conceded that he was required to show under the 2015 verison of Chapter 64 that the evidence to be tested had a "reasonable likelihood" of containing biological material, he claimed to have met that requirement only as to 86 of the entries.[138] He further claimed that 15 of the entries were items that had been lost or destroyed by the State, and he sought to have the trial court presume that DNA testing on the missing items would have produced exculpatory results.

---

[138] He claimed that either the Department of Public Safety or Dr. Watson had made such a determination with respect to 86 of the entries.

Appellant's claim in this motion to have satisfied the "not to unreasonably delay" requirement was perfunctory, consisting of a half-page paragraph. In that paragraph, he simply stated that he did "not have an execution date at this time" and that the parties "have been litigating the DNA testing issue since 2011." He mentioned the fact that his motion was filed after September 1, 2015, and that there were amendments to Chapter 64 effective that date, but, pointedly, he made no attempt to explain how that fact supported his claim that his motion was not filed to unreasonably delay his execution. He did cite our prior decision in *Skinner v. State*[139] for the proposition that a motion for DNA testing in that case was not dilatory because the convicted person did not have an execution date and a federal habeas appeal was pending.

This new motion was discussed during a March 2017 hearing.[140] Appellant's habeas counsel reiterated an earlier suggestion that the evidence could be tested a little at a time, claiming that the Department of Public Safety could test only around 20 items every 60 to 90 days. The habeas court again pushed back against that idea:

> The problem with not doing it all at the same time is the problem we're having now. We are now eight years removed from his initial stay, so if there needs to be any testing done, if that standard is met, it ought to be done now and then on the outside chance there is something from that testing that points to somebody else, so be it, but if it doesn't, I don't think you get to come back to the table over and over and drag this out forever.

The parties and the trial judge discussed sending the judge briefs on several different legal issues. They agreed upon a deadline of April 10.

But a little more than a week after that deadline, on April 18, 2017, Appellant created a

---

[139] 122 S.W.3d at 811.

[140] This motion was attached as an exhibit to the hearing (on March 8) and was filed on March 13.

roadblock to resolving the DNA issues—his motion to disqualify Judge Richardson. As we have explained earlier, this motion was filed more than two years after Judge Richardson was elected to the Court of Criminal Appeals.

And a few months after that roadblock was resolved, Appellant created another one—his December 2017 motion to disqualify the assistant attorney general. As we explained earlier, Appellant claimed that the Attorney General's Office had withheld exculpatory information—the previously referred-to Crime Stoppers tip—and called upon the trial court to exercise its authority under Article 2.07 to appoint and remove an attorney *pro tem*. The earlier motion to compel production of the Crime Stoppers tip had been filed in August 2016 and had claimed that Appellant learned of the tip from documents received from the El Paso District Attorney's Office in July 2016. Appellant did not explain why it took him over a year to file the disqualification motion.

Not much happened during the years of 2018 to 2021. Appellant sought a status conference in February 2019, and later that month the State moved to set an execution date, which Appellant opposed. In his opposition pleading, Appellant proposed that the trial court wait to set an execution date until after the United States Supreme Court decided whether to grant certiorari on his *Atkins* claim. We had rejected his *Atkins* claim in 2014, but we reconsidered the claim in 2018 in light of the Supreme Court's decision in *Moore v. Texas*[141] and again denied relief.[142] The Supreme Court denied certiorari on October 7, 2019.[143] On October 22, 2019, the State advised the trial court that certiorari had been denied. But Appellant's opposition pleading had also stated, "This Court should

---

[141] 581 U.S. 1 (2017).

[142] *Ex parte Wood*, 568 S.W.3d 678 (Tex. Crim. App. 2018).

[143] 140 S. Ct. 213 (2019).

unequivocally reject any request by the State to set an execution date now while the DNA motions, and related Chapter 64 motions, are pending."

On March 3, 2022, the trial judge denied Appellant's motion for DNA testing, along with three other motions: his motions to mitigate harm, to disqualify the assistant attorney general, and to test biological samples from Salvador Martinez.[144] The trial judge issued no findings of fact, and Appellant did not file a request for findings.

As we explained earlier, Appellant filed a new motion to remove the assistant attorney general on March 18, 2022, and this motion relied upon our December 2021 decision in *Stephens*. On March 28, 2022, Appellant filed a motion to rescind the DNA orders signed on March 3. On April 1, 2022, he filed a notice of appeal.

On April 11, 2024, Appellant transmitted a reply brief that exceeds the word limits. Concurrently with his reply brief, he transmitted three motions: (1) to allow his reply brief to exceed the word limits, (2) to disqualify Judge Richardson from the case on appeal and request the Governor to appoint a replacement judge, and (3) to supplement the record with seven items. His motion to supplement the record includes two reporter's records of hearings that were already attached as exhibits in the clerk's record forwarded to us, and it includes the order denying "alternative suspect" DNA testing that he had attached as an exhibit to his opening brief. The remaining four items, however, were brought to our attention for the first time on April 11, 2024, despite the fact that three

---

[144] The order denying the motion to test biological samples from Martinez (the so-called "alternative suspect") was not in the record forwarded to this Court. As explained later, Appellant filed a motion to supplement the record. We grant this motion solely as to the "alternative suspect" order and will assume that his Appendix C to his opening brief is an accurate copy of that order. We deny his motion as to his other supplementation requests. However, we have treated court reporter's records that are included in the clerk's record before us as part of the appellate record. *See infra* at text, two paragraphs down, discussing the motion to supplement.

were documents from the State dated March 17, 2022, and one was a court reporter's record from hearings conducted in August 2011.[145]

The above timeline shows a course of conduct designed to draw out DNA proceedings to try to delay Appellant's execution as long as possible. Despite the fact that Chapter 64 was enacted in 2001 and the appropriate testing technology was available in 2003, Appellant waited until 2010 to file his first DNA motion and until 2017 to file his most recent one. The tardiness of these filings exceed periods we have previously found to indicate unreasonable delay.

Moreover, Appellant's core DNA-motion filings consisted of at least four crime-scene motions for DNA testing, spread out over five years, with the last motion seeking the testing of more than 100 items. The piecemeal litigation of claims in a death-penalty case is a classic sign of purposeful delay.[146] A convicted person ought to present his claims "with dispatch for determination, rather than doling them out one-by-one."[147]

Although amendments in 2011 and 2015 changed some of the standards for DNA motions, those changes do not show that Appellant's piecemeal litigation of his DNA motions was necessary. The amendments cannot justify the delay in bringing his first two DNA motions because they preceded the 2011 amendments. Moreover, Appellant made no effort in his third and fourth DNA

---

[145] And as we noted earlier, his reply brief quotes from supposed emails from March 2022 that are outside the record. *See supra* at n. 74.

[146] *See Reed*, 541 S.W.3d at 778 (Referring to a prior habeas proceeding, "we noted that Reed has taken a 'piecemeal approach' in his post-conviction litigation."); *Ex parte Carr*, 511 S.W.2d 523, 525 (Tex. Crim. App. 1974) (quoting *Sanders v. United States*, 373 U.S. 1, 18 (1963)) (referring to "needless piecemeal litigation, to entertain collateral proceedings whose only purpose is to vex, harass, or delay").

[147] *Carr*, 511 S.W.2d at 525.

motions to explain how the amendments impacted the availability of testing under Chapter 64 for the various items for which testing was requested. As explained earlier, Chapter 64 places the burden on him to make the required showing. A detailed explanation with respect to each item would have been ideal, but at least a general explanation for classes of items was called for.

Perhaps one might say that the 2015 "reasonable likelihood of containing of biological material" standard was the key to everything, because Appellant simply could not meet the earlier requirement of showing that the biological material existed. That would conflict with his third motion, but perhaps it could be argued that the third motion was just wishful thinking. But Appellant made no effort to show that. And considering the amount of time that had already been spent on DNA motions, one would expect a motion to be filed shortly after the 2015 amendments—not in 2017.

In any event, Appellant's piecemeal litigation was not limited to his crime-scene motions for DNA testing. He also doled out various ancillary motions. He moved to delay *Atkins* proceedings on the basis of his pending DNA motions. He was partially successful in that effort and in turn relied upon that success—the continued pendency of *Atkins* proceedings—to contend that his DNA motions were not creating undue delay. Between some of his DNA motions, Appellant also filed various other motions upon which the parties and the trial court had to expend time, including his "alternative suspect" motion. After his last DNA motion, Appellant delayed proceedings further by moving to recuse the trial judge. And after that matter was resolved, he moved to recuse the assistant attorney general.

Even if the ancillary motions had all been legitimate in the abstract, Appellant doled many of them out one at a time to further delay the proceedings. And regardless of whether there was a

procedural default, a number of the motions were clearly filed late. The "alternative suspect" motion was filed in 2015 even though the samples had been obtained from Martinez in 1987, and, as we explained earlier, Appellant's 2015-based reason for the late filing does not stand up to scrutiny. The judicial-disqualification motion was filed in 2017 even though Judge Richardson started campaigning for our Court in 2013, was elected in 2014, and began serving in 2015.[148] And the first motion to disqualify the assistant attorney general was filed more than a year after Appellant claims he discovered the information that formed the basis for his motion.

Moreover, Appellant filed a post-order motion to disqualify the assistant attorney general on an entirely new basis. As we have explained earlier, that post-order motion was untimely. That motion also constituted more piecemeal litigation of ancillary motions.

And the piecemeal litigation of ancillary motions that could have been filed earlier has continued even on appeal. At the last possible moment, when Appellant's reply brief was due, he has filed a motion to supplement the record with at least some items he could have and should have brought to this Court's attention earlier. And at the same time, he has filed a motion to have this Court seek an outsider to serve as a replacement judge for Judge Richardson. Appellant knew that Judge Richardson was a judge on this Court when he filed his notice of appeal *more than two years earlier*.

And at least some of his ancillary motions were clearly without merit, as illustrated by our disposition of Appellant's claims on appeal.

---

[148] In his reply brief, Appellant says he filed his motion to disqualify "promptly after learning of the link on Judge Richardson's campaign website." Appellant does not say how or when he learned of the link, and he does not provide any record citations to support his assertion. In any event, all of the information Appellant has relied upon to advance his judicial disqualification claim was publicly available.

Moreover, the record also reveals large spans of time in which Appellant failed to exert any effort to timely obtain DNA testing. Appellant could have filed a motion for DNA testing in 2001, but his first DNA motion was filed in 2010. For most of the 69 items listed in his third DNA motion, Appellant gave no guidance on whether they were even suitable for testing. Instead, he sought expert assistance to make that determination but for years failed to adequately follow up on obtaining that assistance. In his fourth motion, he indicated that only 86 of his 142 requested entries had been designated suitable for testing. Even after accounting for the 15 lost or destroyed items, that still left 41 entries with an unknown status, potentially to be decided later.

The record also indicates that Appellant sought even more delay than he was able to obtain. He sought to have his *Atkins* proceedings placed completely on hold until the DNA issues had been resolved. If he had succeeded, it is possible that the *Atkins* proceedings would still be pending. He also suggested that testing occur a little at a time, which had the potential to draw out proceedings for years.

And the trial judge complained several times that Appellant was unduly delaying proceedings. The first of those complaints occurred in 2011, but Appellant's proceedings were not resolved until 2022. And even now, on appeal, Appellant has filed tardy motions that seek to create further delay.

Appellant's main argument in his various motions for DNA testing on the "unreasonable delay" issue has been that no execution date was set. We find that to be a hollow contention when considered in light of the way Appellant has used DNA proceedings to delay his *Atkins* proceedings and to put off the setting of an execution date. And the *Skinner* case he cited is clearly distinguishable. Skinner and Appellant were each convicted before Chapter 64 was enacted. But

our decision in *Skinner* was issued in 2003, a mere two-and-a-half years after enactment.[149] Although the case does not recite when the motion was filed, it was obviously filed sometime before then. By contrast, Appellant did not even start filing DNA motions until nine years after Chapter 64 was enacted, and the DNA order in this case was entered more than two decades after the advent of Chapter 64 and more than six years after the 2015 amendments. Appellant's history of piecemeal litigation, the effect of this litigation in delaying his execution date, and his failure to advance final scrutiny of his claims in a timely fashion, all make this case different from *Skinner*.

In his opening brief, Appellant's only argument on the unreasonable delay issue is to set out a timeline of events consistent with the timeline we have set out. Appellant fills in this timeline with events occurring in 2013 and 2014 that relate to his *Atkins* claim in the habeas action, including Judge Richardson's findings of fact and this Court's adoption of those findings. Those events in no way excuse any delay by Appellant in the DNA case. And to the extent the timeline shows activity by Appellant, it also shows his piecemeal doling out of claims in various motions, as we have previously explained.

In his reply brief, Appellant expands on his allegation that the timeline shows diligence rather than delay. He contends that he filed approximately 40 pleadings related to the Chapter 64 litigation and that there were four in-person hearings. He claims that this "demonstrates the seriousness of the issues raised and the uniqueness of the case" and that his "tenaciousness is not the consequence of pursuing a strategy of unreasonable delay. We disagree. The proliferation of pleadings shows the piecemeal nature of the litigation. And several of his key ancillary motions are clearly without merit. And many of his motions were, by any reasonable definition, late. The record amply shows that

---

[149] *See Skinner*, 122 S.W.3d 808.

Appellant "doled out" various motions instead of pursuing them with dispatch.

Appellant also contends that the judge found that his *first* DNA motion satisfied all of the Chapter 64 requirements for testing, which would include that the request was not made to unreasonably delay the execution of sentence. Even assuming that contention to be true, it does not help Appellant here. The first motion was filed at a time when it was less evident that it would delay his execution. Appellant had a pending intellectual-disability claim that we held needed to be litigated. That does not mean his first motion was not tardy. It was tardy. And Appellant still has to account for motions two, three, and four. And over the entire period that his subsequent DNA motions having been pending, he has a pattern of piecemeal litigation and delay. And as can be seen with his latest flurry of motions filed with his reply brief, *he is still doing it.*

In light of all of this discussion, we conclude that Appellant has not met his burden to show that his request for DNA testing has not been made to unreasonably delay the execution of sentence. That failure is alone sufficient to support the trial court's order denying DNA testing.

We affirm the judgment of the trial court.

Delivered: May 22, 2024
Publish